# United States Court of Appeals
## For the First Circuit

Nos. 20-2189
    20-2190

UNITED STATES

Appellee,

v.

IVONNE M. FALCÓN-NIEVES

and

MARIELIS FALCÓN-NIEVES,

Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Montecalvo, Circuit Judges.

Martin G. Weinberg, with whom Kimberly Homan was on brief, for appellant Ivonne M. Falcón-Nieves.
Kendys Pimentel-Soto, with whom Kendys Pimentel-Soto Law Office LLC, Francisco Adams-Quesada, and Francisco J. Adams-Quesada Law Office were on brief, for appellant Marielis Falcón-Nieves.
Timothy R. Henwood, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

August 23, 2023

BARRON, **Chief Judge**.  These consolidated appeals concern challenges by two sisters, Ivonne Falcón-Nieves ("Ivonne") and Marielis Falcón-Nieves ("Marielis"), to their convictions on various federal charges that relate to alleged public corruption in the Commonwealth of Puerto Rico.  The sisters contend that the convictions are not supported by sufficient evidence and so must be reversed.  They argue in the alternative that the convictions must be vacated because their motions for severance of their trials from that of one of their codefendants were wrongly denied.  Ivonne also contends that one of her convictions for conspiracy must be vacated due to a prejudicial variance.

The government contends that the evidence suffices to support all of the sisters' convictions, such that none may be reversed.  It also rejects Ivonne's contention regarding the prejudicial variance.  But the government concedes that it was error to deny the sisters' severance motions and that, as a result, their convictions must be vacated.

We agree with the government that the evidence suffices to support Ivonne's conviction on one of the three counts of honest services wire fraud with which she was charged, her convictions for conspiracy to commit honest services wire fraud or federal program bribery, and Marielis's conviction for aiding and abetting extortion.  But we reject the government's arguments that the evidence suffices to support Ivonne's conviction for federal

- 3 -

program bribery, her other two convictions for honest services wire fraud, and her conviction for aiding and abetting extortion. Accordingly, we reverse those convictions. We also agree with Ivonne that one of her conspiracy convictions must be vacated due to a prejudicial variance. Finally, we vacate the rest of the convictions because we do agree with the parties that it was error for the District Court to deny the sisters' severance motions.

**I.**

On December 2, 2015, a grand jury in Puerto Rico issued a twenty-five-count indictment against several government officials and their associates that alleged public corruption in Puerto Rico. Among those indicted were the appellants: Ivonne, the Vice President of Administration and Finance for the Puerto Rico Aqueduct and Sewer Authority ("AAA"),[1] and her sister, Marielis.

The indictment charged Ivonne with seven counts that centered on her alleged use of her position at AAA to aid private parties seeking government contracts. The counts were for: conspiracy to commit honest services wire fraud or federal program bribery, in violation of 18 U.S.C. § 371 (Count One); conspiracy

_____

[1] Prior to January 2013, Ivonne was the Treasurer of AAA. AAA is the Spanish-language acronym for the Puerto Rico Aqueduct and Sewer Authority. It is also referred to as PRASA, the English-language acronym for the entity, throughout the record in this case. This opinion will use the Spanish-language acronym.

to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 (Count Six); honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Counts Seven, Eight, and Nine); federal program bribery, in violation of "18 U.S.C. §§ 666(a)(1)(B) and 2" (Count Thirteen); and aiding and abetting in the commission of extortion, in violation of "18 [U.S.C.] Section 1951(a) and 2" (Count Seventeen).

The indictment charged Marielis with one count of aiding and abetting extortion, in violation of "18 [U.S.C.] Section 1951(a) and 2" (Count Seventeen). The charge concerned her alleged role in orchestrating payments for one of AAA's contractors.

Prior to, throughout, and after the trial, Ivonne and Marielis requested that their cases be severed under Federal Rule of Criminal Procedure 14 from the cases of several of their codefendants, including that of Glenn Rivera ("Rivera"), a former employee of the Puerto Rico House of Representatives ("House"). Ivonne and Marielis argued that severance was proper because the indictment charged a number of their codefendants, including Rivera, with participation in a fraud against the House in which, according to the indictment, neither Ivonne nor Marielis was implicated.[2]  See Fed. R. Crim. P. 14(a).

_____

[2] Marielis also argued that the charges against her were unrelated to the charges in every other count in the indictment.

- 5 -

The District Court denied Ivonne and Marielis's requests for severance. A jury found Ivonne and Marielis guilty on all the counts with which they were charged. The sisters thereafter moved for judgments of acquittal -- as they had at the close of all the evidence and at the close of the government's case. The sisters did so in part on the ground that the evidence presented at trial was insufficient to support their convictions on any of the counts for which they had been charged.

The District Court denied Ivonne's and Marielis's motions for judgments of acquittal. Ivonne and Marielis timely appealed.

**II.**

Ivonne and Marielis each argue on appeal that their convictions must, at a minimum, be vacated because the District Court erroneously denied their requests for severance under Federal Rule of Criminal Procedure 14 from Rivera's trial. The government concedes as much based on our decision in United States v. Martínez, 994 F.3d 1, 11-17 (1st Cir. 2021), in which we vacated the convictions of one of Ivonne and Marielis's codefendants in the underlying action, former administrator of the Puerto Rico Workforce Development Administration ("ADL") Sally López Martínez ("López"). See id.

We vacated López's convictions in Martínez on the ground that the District Court improperly denied López's motions for

severance from being tried with Rivera.  See id.  We explained that denying López's request for severance allowed the jury in her case to be "exposed to days of detailed evidence regarding" her codefendants' activities pertaining to corruption in the House, even though much, if not all, of that evidence would have been inadmissible at a separate trial of López herself, given that she was not alleged to have been involved in the corruption related to the House.  Id. at 14-15.

We agree with Ivonne, Marielis, and the government that the reasoning on which Martínez relied in vacating the convictions in that case applies equally to Ivonne's and Marielis's cases. Thus, Ivonne's and Marielis's convictions must be vacated due to the District Court's denial of the sisters' requests for severance. As a result, we need not reach many of the sisters' other arguments for vacating their convictions.  Nor need we address their challenges to their sentences.

We do still need to address, however, their contentions that their convictions must be reversed -- rather than merely vacated -- because their convictions are not supported by sufficient evidence.  And we also need to address Ivonne's related argument that she was prejudiced by a variance as to one of her conspiracy convictions.  We next take up those arguments.

## III.

In reviewing a sufficiency challenge, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Our review of preserved sufficiency challenges is de novo, see United States v. Millán-Machuca, 991 F.3d 7, 17 (1st Cir. 2021), while we review sufficiency challenges raised for the first time on appeal for "clear and gross injustice," United States v. Ponzo, 853 F.3d 558, 580 (1st Cir. 2017) (quoting United States v. Foley, 783 F.3d 7, 12 (1st Cir. 2015)).

We will begin with the sufficiency challenges that Ivonne makes to her convictions on the substantive counts for federal program bribery and honest services wire fraud -- which are Counts Seven, Eight, Nine, and Thirteen. We will then address Ivonne's sufficiency challenges to her conspiracy convictions, which are Counts One and Six. Along the way, we will also address the prejudicial-variance-based challenge that she makes to her conviction on Count One. Finally, we will address the challenges that Marielis and Ivonne raise with respect to their convictions on Count Seventeen, which is for aiding and abetting extortion.

**A.**

We begin with Ivonne's sufficiency challenge to her conviction on Count Thirteen for federal program bribery under "§§ 666(a)(1)(B) and 2." This count alleges that businessman and political operator Anaudi Hernández Pérez ("Hernández") "gave [Ivonne] things of value to influence and reward [Ivonne] for the use of her official position to assist [Hernández] and his associates by providing favorable treatment for [Hernández] and his associates in official matters before AAA."

Ivonne takes aim in part at the sufficiency of the evidence as to the "jurisdictional" element of § 666(a)(1)(B). Her focus is on the element that requires the government to prove beyond a reasonable doubt that the "agent" accused of a violation under this provision works for an "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance," § 666(b); see United States v. Bravo-Fernández, 913 F.3d 244, 247 (1st Cir. 2019).

Ivonne concedes that she did not raise this ground for challenging the conviction below. Our review of the challenge is thus only for "clear and gross injustice," Ponzo, 853 F.3d at 580, which is "a particularly exacting variant of plain error review," Foley, 783 F.3d at 12.

Under this standard, Ivonne must show that the four prongs required to demonstrate plain error are met. See United States v. Duarte 246 F.3d 56, 60 (1st Cir. 2001) (explaining that to establish plain error, a party must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings"). And we will only reverse if her conviction would result in "clear and gross injustice." United States v. Pratt, 568 F.3d 11, 15 (1st Cir. 2009) (citation omitted). Nonetheless, we conclude that Ivonne has made the requisite showing. See United States v. Dawlett, 787 F.2d 771, 775-76 (1st Cir. 1986) ("'It is the imperative duty of a court to see that all the elements of [a] crime are proved, or at least that testimony is offered which justifies a jury finding those elements.' In this instance the insufficiency of the evidence mandates reversal since plain error has been committed in an area so vital to the defendant. Surely our concept of justice is violated when a man is convicted of a crime he did not commit." (alteration in original) (citation omitted)).

The government concedes -- and we agree -- that the evidence at trial that supportably shows that AAA received a gross amount of federal funding in excess of $10,000 does not in and of itself suffice to prove that AAA received the kind of benefits

- 10 -

specified in § 666(b). But the government contends that other evidence presented at trial does, such that there is sufficient record support to show that this jurisdictional element is met.

The government rests this argument on the contention that evidence in the record suffices to show that AAA received the requisite kind and amount of funds in the form of the Workforce Investment Act ("WIA") funds provided to AAA by the ADL. But we agree with Ivonne that the evidence does not suffice to permit a rational jury to find beyond a reasonable doubt that the requisite amount of WIA funds were in fact transferred to AAA -- even if we assume that WIA funds are federal benefits.

The government counters by pointing to testimony from multiple government witnesses -- including Hernández, one of his associates, and a former ADL employee -- that AAA signed a contract that contemplated the transfer of more than $10,000 in WIA funds from ADL to AAA. And the record does supportably show that the contract provided that WIA funds of that amount would be transferred from ADL to AAA to pay Links Group, a company associated with Hernández that would provide employment training for AAA employees in return for the WIA funds. Moreover, the record supportably shows that the contract was signed and that Links Group provided some of the training described in the contract.

But the question that matters is whether the record suffices to show that the requisite amount of WIA funds was in fact transferred from ADL to AAA as that contract contemplated. And the record contains nothing to show that such an amount was.

The only evidence that directly addresses the amount of funds transferred is the testimony of Mariet Rodriguez Melendez ("Rodriguez Melendez"), a former employee at ADL who directed the agency's rapid response unit for displaced workers and employees. But she testified that ADL does not pay providers funds contemplated in their contracts with ADL until after the providers' services are rendered; that at least one contract signed by AAA and ADL, under which ADL was to provide funds for AAA to pay Links Group to train AAA employees, was cancelled; and that ADL did not transfer the funds contemplated in the cancelled contract to AAA and "never paid for any Links Group contract."

The government points to no evidence that contradicts or even casts doubt on this testimony. Nor does the government identify anything in the record that would permit a rational jury to conclude in the face of this testimony that the requisite amount of WIA funds had been transferred from ADL to AAA. See Bravo-Fernández, 913 F.3d at 248 (noting that evidence that may establish the § 666 jurisdictional element may include, for example, witness testimony, "with the support of documentation

- 12 -

also admitted into evidence," that the relevant government entity "annually received" federal benefits totaling over $10,000).

To that point, none of the testimony in the record on which the government relies supportably shows that any WIA funds were transferred from ADL to AAA, let alone that the required amount was so transferred. Certainly, the testimony regarding what "was going to" happen under the contracts provides no basis for concluding that the funds were in fact transferred. Nor does testimony that some services were rendered pursuant to the contract in question, as nothing in the record suffices to support a finding that the requisite amount of funds would have been transferred in consequence of the services that the testimony supportably shows were rendered.

Thus, the evidence plainly does not suffice to permit a rational jury to find beyond a reasonable doubt that the jurisdictional element of § 666(a)(1)(B) is met. See United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998) ("If the evidence 'viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,' [we] must reverse the conviction. This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, 'a reasonable jury must necessarily entertain a reasonable

doubt.'" (cleaned up) (citations omitted)). Accordingly, this conviction must be reversed. See United States v. Peña-Lora, 225 F.3d 17, 26-28 (1st Cir. 2000); see also United States v. Todosijevic, 161 F.3d 479, 483 (7th Cir. 1998) ("[R]equirements for plain error are met with respect to sufficiency of the evidence claims 'if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction would be shocking.'" (citations omitted)); United States v. Spinner, 152 F.3d 950, 956 (D.C. Cir. 1998) ("It would be a manifest miscarriage of justice to let a conviction stand [where] the government failed to present any evidence on an essential element of the crime.").

**B.**

We now turn to Ivonne's challenges to the sufficiency of the evidence supporting her convictions on Counts Seven, Eight, and Nine, which were for honest services wire fraud under 18 U.S.C. §§ 1343 and 1346. As these sufficiency challenges are preserved, our review is de novo. See Millán-Machuca, 991 F.3d at 17. We conclude that the evidence suffices to support Ivonne's conviction on Count Seven but not her convictions on Counts Eight and Nine.

**1.**

To secure a conviction for honest services wire fraud under §§ 1343 and 1346, the government must show "(1) the defendant's knowing and willing participation in a scheme or

- 14 -

artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme." United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996) (footnote omitted).[3] The government contends that it could show that Ivonne acted with a "specific intent to defraud" by demonstrating that she had a "'bribery-like, corrupt intent' to deprive the public of honest services," Martínez, 994 F.3d at 7 (citations omitted). The government further contends that it could prove that Ivonne had such a "bribery-like, corrupt intent" by showing that she received a bribe by accepting "a thing of value while 'intending to be influenced' by it to perform an official act," id. at 6-7 (citation omitted).

In making this argument, the government emphasizes that such a quid-pro-quo "agreement need not be tied to a specific act by the recipient." United States v. McDonough, 727 F.3d 143, 152 (1st Cir. 2013). Rather, "[i]t is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose." Id. at 152-53 (citation omitted). Further, "[b]ribery can be accomplished through an ongoing course of conduct, so long as the

_____

[3] The parties do not dispute that the second element required to prove honest services wire fraud was met for all three honest services wire fraud counts on which Ivonne was convicted based on emails Ivonne sent or received over the course of 2013. See Sawyer, 85 F.3d at 723.

evidence shows that the 'favors and gifts flowing to a public official [are] in exchange for a pattern of official actions favorable to the donor.'" Woodward v. United States, 905 F.3d 40, 46 (1st Cir. 2018) (alterations in original) (citation omitted).

The government relies on McDonnell v. United States, 579 U.S. 550 (2016), for the standard for what constitutes taking an "official act."  There, consistent with a stipulation between the parties, the Supreme Court of the United States drew on the definition of "official act" in the federal bribery statute, 18 U.S.C. § 201, to define the "official act" component of the quid-pro-quo exchange required to show a bribery-like corrupt intent for purposes of honest services wire fraud under § 1343.  See McDonnell, 579 U.S. at 562, 580.  In doing so, the Court explained that an "official act" can be proved by showing that the defendant "made a decision or took an action" -- or agreed to do so -- "on" a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought before" any public official.  Id. at 567 (quoting § 201(a)(3)).  The Court went on to explain that the defendant may commit an "official act" for purposes of honest services wire fraud by "us[ing] h[er] official position to provide advice to another official, knowing

- 16 -

or intending that such advice will form the basis for an 'official act' by another official." Id. at 572.[4]

**2.**

The government contends that the evidence suffices to support Ivonne's conviction on Count Seven because it suffices to show that she agreed to take "official acts" to give preferential treatment to a purchasing-website contract proposal submitted to AAA by a company associated with Hernández, 3CG, in exchange for a "stream of benefits" that he provided to her. See Woodward, 905 F.3d at 46. In challenging that contention, Ivonne does not dispute that the evidence suffices to show that from roughly February 2013 to May 2013 she was receiving benefits from Hernández and that during that same span of time she both referred the 3CG purchasing-website proposal to Héctor Sanabria ("Sanabria") -- who was AAA's Director of Information Technology and thus the person at AAA who was responsible for making a recommendation to AAA leadership about to whom to award the contract for AAA's purchasing website -- and discussed that proposal with him. But Ivonne contends the evidence still does not suffice to support her conviction on Count Seven. We disagree.

---

[4] Ivonne does not dispute that McDonnell's definition of an "official act" governs the present case.

**a.**

We begin with Ivonne's contention that the evidence does not suffice to show that any of the alleged official acts she took with respect to the 3CG purchasing-website contract proposal were taken in exchange for the stream of benefits from Hernández.[5]  See id.  She explains that there is no direct evidence that she took any such acts in exchange for that stream of benefits.  She goes on to argue that this evidentiary gap cannot be bridged circumstantially because the benefits that the evidence shows she received were simply too "paltry" to permit a rational jury to infer the exchange's existence from the fact that the acts were taken coincident to the receipt of the benefits.

But the evidence suffices to show that the stream of benefits in question was hardly de minimis.  The benefits consisted of at least eight to ten meals paid for by Hernández and his associates, including meals at Morton's Steak House, Los Gauchos,

---

[5] To the extent that Ivonne challenges the sufficiency of the evidence supporting her conviction on Count Seven on the ground that she did not have the requisite intent, cf. Sawyer, 85 F.3d at 725 (holding that a conviction of a public official for honest services wire fraud "cannot stand where the conduct does not actually deprive the public of its right to her honest services" and where the official through her conduct "is not shown to intend that [deprivation]"), we do not see how such an intent could not be present if Ivonne agreed to deprive the people of her honest services by agreeing to accept a bribe from Hernández in exchange for things of value provided to Ivonne by Hernández.  Thus, in addressing whether the evidence suffices to show that such an agreement was present, we are addressing, too, whether the evidence suffices to show that Ivonne had the requisite intent.

- 18 -

Devino Vocado, and Peleyo; Hernández's assistance with the appointment of Sonia Barreto ("Barreto"), AAA's Purchasing Director, whom Ivonne wanted appointed; an invitation from Hernández to attend a closed political fundraiser with Barreto; and a Montblanc pen from Hernández.[6]

The cases on which Ivonne relies in urging us to hold that the benefits were too paltry also do not help her. They hold only that the benefits received in those cases were sufficient to support a conviction. They do not hold that benefits must be as substantial as those benefits were to do so. See, e.g., Martínez, 994 F.3d at 8; Woodward, 149 F.3d at 52-53; United States v. Ganim, 510 F.3d 134, 138 (2d Cir. 2007); United States v. Kemp, 500 F.3d 257, 265 n.5, 266-68 (3d Cir. 2007); United States v. Whitfield, 590 F.3d 325, 336 (5th Cir. 2009); United States v. Abbey, 560 F.3d 513, 515 (6th Cir. 2009). Moreover, the government points to cases that hold that benefits quite comparable to those at issue here do suffice. See Woodward, 149 F.3d at 52-53 (affirming a conviction for honest services wire fraud involving the receipt of meals, rounds of golf, and other entertainment); Sawyer, 85 F.3d at 731 (finding same evidence sufficient for proper conviction); see also United States v. Ring, 706 F.3d 460, 464 (D.C. Cir. 2013) (affirming a lobbyist's conviction for honest services wire fraud

---

[6] Hernández paid a total of $1,665 for two Montblanc pens, only one of which he gave to Ivonne.

involving the giving of "dinners, drinks, travel, concerts, and sporting events").

**b.**

Ivonne next contends that a rational jury could not infer the required exchange occurred because her actions with respect to the 3CG proposal (even if "official acts" under McDonnell) constituted standard practice done in the "usual course of AAA business." Specifically, Ivonne contends that -- prior to the opening of a formal bidding process, which is when she was assisting 3CG with its proposal -- it was "standard practice" to "provid[e] information to persons preparing proposals for submission;" to make "suggestions [to such persons] geared toward making [their] proposals more in line with" AAA; and "[r]efer[]" such proposals "to Sanabria for his evaluation."

But the record supportably shows that, despite 3CG's limited experience in the relevant area, Ivonne helped 3CG develop an initial proposal and provided 3CG with access to information that it otherwise would not have had in an effort to bolster its revised proposal when Sanabria deemed the initial one deficient. The record then goes on supportably to show that she responded to Sanabria's criticism of the revised proposal's reliance on a six-year-old report by stating that the use of the report in the proposal was "at [her] request[,]" while explaining that the report constituted a "1 million dollar expense for the AAA that we never

executed," that she "want[ed] to turn that expense into an investment," and that "[i]n 6 years we did NOT implement the recommendation and now we are going to make the change."

Ivonne points to no evidence that establishes (or even suggests) that assistance of this quite substantial sort from someone in her position within AAA was standard practice, let alone that it was standard practice for a proposal from a potential bidder with as thin a track record as 3CG's. Rather, she merely asserts in conclusory fashion that the assistance of the kind that she provided to this company's proposal was standard fare. Thus, we do not see how this line of argument can support her sufficiency challenge. See United States v. Ridolfi, 768 F.3d 57, 61 (1st Cir. 2014) (stating that a jury may reach a guilty verdict by drawing "reasonable, common sense inferences" from the evidence).

## c.

Ivonne also contends that her conviction on Count Seven cannot stand because the evidence presented at trial did not suffice to show that, at the time Ivonne accepted the stream of benefits she allegedly accepted, she understood that she was accepting those things in exchange for official acts specifically regarding the 3CG purchasing-website contract proposal. Ivonne relies here on the Second Circuit's opinion in United States v. Silver, 948 F.3d 538 (2d Cir. 2020).

- 21 -

There, the Second Circuit reviewed jury instructions that allowed for an honest services conviction so long as the evidence showed that, in exchange for a thing of value, a public official "promise[d] to take some or any official action beneficial to the payor as the opportunity to do so arises." Id. at 552-53. Silver held that the instructions were problematic because the evidence must suffice to show that, in exchange for a thing of value, the public official "promise[d] to take official action on a particular question or matter as the opportunity to influence that same question or matter arises." Id. at 553.

There is a question of whether Ivonne's challenge on this score was preserved below. There is a question, too, of whether we should adopt the Silver standard in this Circuit. But, even if we were to resolve both questions in Ivonne's favor, this challenge would fail.

Testimony at trial suffices to show that during the same period that Ivonne was allegedly receiving benefits from Hernández, she discussed the purchasing-website contract proposal with him. And the record also supportably shows that, during this same period, Ivonne took the various actions described above in support of that proposal. From this evidence, a rational jury could conclude that Ivonne promised to take the actions that she allegedly took with respect to the 3CG purchasing-website proposal in exchange for the stream of benefits bestowed upon her by

Hernández. And nothing in Silver itself purports to contradict that assessment of the record, as it concerned only a challenge to jury instructions that did not require a finding of there having been any promise to take official actions with respect to any specific matter at all. We thus reject Ivonne's contention that her conviction on Count Seven must be reversed under the standard set forth under Silver, as that standard merely requires that the evidence presented at trial show that a defendant promise, in exchange for benefits, to take action on a specific matter rather than promising "to take some or any official action beneficial to the payor as the opportunity to do so arises," id. at 552-53.

**d.**

Ivonne separately argues that even if she took actions with respect to the 3CG purchasing-website contract proposal in exchange for things of value, such actions were not "official acts" under the standard set forth by the Supreme Court in McDonnell. But, as we will explain, the evidence suffices to support the conclusion that Ivonne committed an "official act" by "using h[er] official position to provide advice to" Sanabria, "knowing or intending that such advice [would] form the basis for" Sanabria's "official act" to recommend or decline to recommend the 3CG contract to AAA leadership. See McDonnell, 579 U.S. at 572.

As we have explained, the evidence supports the conclusion that when Sanabria, in evaluating 3CG's revised

purchasing-website contract proposal, criticized the proposal's reliance on a six-year-old report, Ivonne responded that the use of the report in the proposal was "at [her] request." The evidence further shows that Ivonne went on to explain to Sanabria that the report constituted a "1 million dollar expense for the AAA that we never executed" and that she "want[ed] to turn that expense into an investment." And the record also supportably shows that she told Sanabria at that time that "[i]n 6 years we did NOT implement the recommendation and now we are going to make the change."

A rational jury could infer from this evidence that Ivonne's defense of the revised proposal constituted "advice" that Ivonne gave to Sanabria with the "inten[t]" that it would "form the basis for" his decision regarding the revised proposal and was thus an "official act." See id. And this conclusion is further buttressed by evidence that supportably shows that her defense of the proposal's reliance on the six-year-old report in the face of Sanabria's expressed concerns followed not only her referrals of both 3CG's initial and revised drafts of the proposal to Sanabria to review[7] but also her instruction to Sanabria to send information to 3CG to assist with the proposals. Thus, we reject Ivonne's contention that the evidence did not suffice to show that she

---

[7] The evidence, particularly Sanabria's testimony, supportably shows that Ivonne and Barreto, who had also been in contact with Hernández and his affiliates at 3CG, referred the initial proposal.

- 24 -

exchanged an "official act" related to the 3CG purchasing-website contract proposal for things of value.

**e.**

Ivonne next contends that a rational jury could not infer from the evidence that she "crossed the line" between accepting things of value "with the understanding that the giver was simply seeking to cultivate a business relationship" and accepting "things of value with the intent -- and agreement -- to perform official acts to favor the interests of the giver." On this front, she argues that Hernández and his partners did not testify to "anything on the stand indicative of an unlawful quid-pro-quo agreement between them and [Ivonne]" and instead merely expressed an interest in "establishing relationships and obtaining access to present business proposals." But insofar as Ivonne means to argue, based on that testimony, that a rational jury could not infer that she understood Hernández to be asking her to take any official action in exchange for the stream of benefits, we cannot agree. As discussed, what the evidence shows about the proximate timing of Hernández's provision of those benefits relative to his discussions with Ivonne about the 3CG proposal suffices to support such an inference.

**f.**

Ivonne next contends that a rational jury could not find the requisite exchange occurred because the evidence shows that

- 25 -

the actions that she took in support of the 3CG proposal were taken to benefit AAA. But, as Ivonne herself concedes, the contention that she "acted for the benefit of AAA" is not "in itself" a sufficient "defense" to her honest services wire fraud charge. And the fact that a rational jury could find on this record that Ivonne believed that the issuance of a purchasing-website contract would benefit AAA does not preclude a finding that Ivonne's favorable treatment of 3CG's purchasing-website contract proposal was nonetheless given in exchange for the benefits bestowed upon Ivonne by Hernández. Such treatment, if undertaken in exchange for things of value, deprives the public of its right to Ivonne's honest services, even if the issuance of a purchasing website contract would ultimately benefit AAA. See Sawyer, 85 F.3d at 724-25. Thus, this last aspect of her sufficiency challenge to her conviction on Count Seven also fails.

### 3.

We next address Ivonne's challenge to the sufficiency of the evidence supporting her conviction on Count Eight, which is also for honest services wire fraud under §§ 1343 and 1346. As with Count Seven, the charge against Ivonne for honest services wire fraud on Count Eight is predicated on her allegedly having deprived the people of the Commonwealth of Puerto Rico of her honest services through a quid-pro-quo agreement with Hernández. See Skilling v. United States, 561 U.S. 358, 408-12 (2010).

Specifically, Count Eight turns on Ivonne's having received from Hernández and his associates the same things of value at issue in Count Seven in exchange for Ivonne's allegedly taking an "official act" related to AAA's participation in a job fair operated by a company associated with Hernández.

The government contends that the inference that such an exchange occurred is supported by the circumstantial evidence regarding the benefits that Ivonne allegedly received and the two emails sent to Ivonne regarding the job fair. But, unlike in Count Seven, the record does not supportably show that Ivonne took or planned to take any actions with respect to the job fair, even though it supportably shows that she received the stream of benefits from Hernández, as described above, at some point before she allegedly received the emails regarding AAA's participation in the fair.

The record does supportably show that on October 31, 2013, Hernández sent an email to Ivonne forwarding a message from López that requested that AAA participate in a job fair hosted by ADL and operated by a company associated with Hernández. It further supportably shows that, on November 4, 2013, Hernández sent an email to Barreto, copying Ivonne, that included two attachments containing information about the layout of the job fair and the AAA booth at the job fair. But it does not contain any evidence that Ivonne actually read and responded to the emails

- 27 -

sent to her or took or planned to take any particular action related to AAA's participation in the job fair. And without evidence that Ivonne took or planned to take any action with respect to the job fair, a jury could not have drawn any non-speculative inference that Ivonne took an official act in exchange for something of value. See United States v. Guzman-Ortiz, 975 F.3d 43, 55 (1st Cir. 2020). We thus must reverse her conviction on Count Eight due to a lack of sufficient evidence.

**4.**

We come to the same conclusion with respect to Ivonne's sufficiency challenge to her conviction on Count Nine, which was also for honest services wire fraud under §§ 1343 and 1346. This count was predicated on the same activity that formed the basis for Count Eight. The only difference between the two counts is that Count Eight was predicated on Ivonne having received the first email related to the job fair mentioned above, whereas Count Nine was predicated on her having received the second email related to the job fair mentioned above.

The parties agree that, as with Count Eight, Ivonne's conviction on Count Nine may stand only if the evidence presented at trial was sufficient to support a conclusion beyond a reasonable doubt by a rational jury that Ivonne agreed to take an official act related to the job fair described above in exchange for the benefits allegedly bestowed upon her by Hernández. Because, as we

explained in the context of Count Eight, a rational jury could not come to such a conclusion without a reasonable doubt, Ivonne's conviction on Count Nine must be reversed.

## C.

We turn now to Ivonne's challenges to her conspiracy convictions on Counts One and Six for violating § 371 and § 1349, respectively. To convict someone under § 371 or § 1349, "the government must furnish sufficient evidence of three essential elements: an agreement, the unlawful objective of the agreement, and an overt act in furtherance of the agreement." United States v. Floyd, 740 F.3d 22, 28 (1st Cir. 2014) (citation omitted). "It also must establish 'the knowing participation of each defendant in [the] conspiracy.'" Id. (alteration in original) (citation omitted). And the government must establish two kinds of intent with respect to the conspiracy: "intent to agree and intent to commit the substantive offense," United States v. Bristol-Mártir, 570 F.3d 29, 39 (1st Cir. 2009) (citation omitted).

We begin by reviewing Ivonne's challenge to the broader of the two conspiracies for which she was convicted, namely the conspiracy alleged under Count One. Reviewing Ivonne's challenge to the sufficiency of the evidence for that conspiracy conviction de novo, see Millán-Machuca, 991 F.3d at 17, we reject it. But we agree with her contention that this conviction must be vacated on the ground that only a narrower conspiracy than the one charged in

- 29 -

the indictment was proved, such that a prejudicial variance resulted. We then review de novo Ivonne's challenge on sufficiency grounds to her conspiracy conviction on Count Six, which we reject as meritless.[8]

**1.**

The indictment under Count One charged Ivonne, Hernández, Barreto, López, and Javier A. Muñiz Alvarez, a businessman who lived in Puerto Rico, with conspiracy to commit honest services wire fraud or federal program bribery, in violation of § 371. The indictment stated with respect to this count that those charged

> did knowingly combine, conspire, confederate, and agree with each other and others . . . to devise and intend to devise a scheme and artifice to defraud and deprive the United States and the citizens of Puerto Rico of the honest services from public officials [López], [Barreto] and [Ivonne], in violation of 18 U.S.C. §§ 1343 and 1346.

In support of this charge, the indictment alleged that the defendants named in Count One engaged in a number of fraudulent schemes. The schemes included each of the ones alleged to underlie the substantive federal program bribery and honest services wire fraud counts with which Ivonne was charged, including the WIA-

---

[8] It is not clear that Ivonne preserved all the challenges to her conspiracy convictions that she brings on appeal. Nevertheless, she contends that de novo review is the proper standard of review, and the government does not contest this, so we review her challenges under this standard.

funded job training scheme, the 3CG website contracting proposal scheme, and the job fair scheme. Additionally, Count One alleged that Ivonne, at Hernández's request, helped facilitate payments to one of AAA's contractors, IA Mech Chem ("IAMC"). IAMC was owned by Ramon Crespo ("Crespo"), who was affiliated with Hernández.

Ivonne contends that the evidence does not suffice to show that she committed the charged offense. But she concedes that for her to be convicted of this count the evidence need not be sufficient to support the conclusion beyond a reasonable doubt that she participated in the broad conspiracy charged to commit federal program bribery or honest services wire fraud via all of the individual fraudulent schemes alleged under Count One. Rather, she accepts that so long as the evidence suffices to show her participation in a narrower conspiracy to carry out any of those schemes, the conviction may not be reversed on sufficiency grounds. She contends, however, that the evidence is not sufficient even to support the conclusion that she so conspired with respect to any of the individual fraudulent schemes alleged under Count One. And that is so, she argues, because "[t]here was no evidentiary basis on which a reasonable jury could conclude beyond a reasonable doubt that [she] knew of the existence of [any of those] conspirac[ies], that she agreed to participate in [them], or that she intended to commit honest services fraud or federal program bribery." See

- 31 -

Bristol-Mártir, 570 F.3d at 39; United States v. Lanza-Vázquez, 799 F.3d 134, 146 (1st Cir. 2015).

Ivonne is right that, for the reasons we explained above with respect to Counts Eight and Nine, the evidence does not suffice to permit a rational jury to find that Ivonne intended to commit honest services fraud or federal program bribery based on the evidence regarding the job fair. In addition, as we have explained, the evidence is insufficient to show there was federal program bribery. And that being so, we see no independent basis for concluding that nonetheless the evidence sufficed to support a rational jury to find that Ivonne conspired to commit that offense.

But, for the reasons that we described above with respect to Count Seven, the evidence does suffice to support the finding that Ivonne agreed to take official acts with respect to the 3CG purchasing-website contract proposal in exchange for the stream of benefits from Hernández. And evidence of such an agreement suffices to support Ivonne's conviction for honest services wire fraud. Yet Ivonne does not argue -- and we do not see how she could argue -- that she could have entered into that agreement without having the requisite intent to commit honest services wire fraud. See Bristol-Mártir, 570 F.3d at 39.

Moreover, the evidence suffices to show that Ivonne, Hernández, and Barreto -- whom Hernández allegedly helped get

appointed, in part by paying her tax debt -- met to discuss the 3CG proposal and both Ivonne and Barreto provided Hernández with information about AAA to assist with the 3CG purchasing-website proposal. And Ivonne does not argue that she could have entered into the agreement with Hernández described above regarding that proposal without knowing of and agreeing to participate in a conspiracy with Hernández and Barreto to commit honest services wire fraud. See Lanza-Vázquez, 799 F.3d at 146. Thus, there is no merit to her sufficiency challenge to her conviction on this count.

**2.**

Ivonne does separately contend that, even if her conviction on Count One need not be reversed on sufficiency grounds, the evidence presented at trial does not suffice to prove the "single conspiracy" alleged in that count of the indictment insofar as that count alleged that Ivonne conspired with all the other defendants named under that count. Thus, Ivonne contends that her conviction on Count One at least resulted in a variance because any conspiracy proved was narrower than the one charged.[9]

_____

[9] Ivonne did not contend in her opening brief that a variance would result if the evidence supported the conclusion that she conspired to commit honest services wire fraud or federal program bribery with all of the coconspirators charged under Count One through some but not all of the fraudulent schemes described under Count One. And, although she contends as much in her Reply, she does not explain how such a variance would be prejudicial. The

She then goes on to argue that the variance was prejudicial and therefore her conviction on Count One must at least be vacated. We agree.

We have explained that "the mere fact that a central person (the 'hub' of a wheel) is involved in multiple conspiracies (the wheel's 'spokes') does not mean that a defendant . . . who participated in a spoke conspiracy may be convicted of participating in an overarching conspiracy encompassing the entire wheel." United States v. Monserrate-Valentín, 729 F.3d 31, 44-45 (1st Cir. 2013) (alteration and citation omitted). Rather, "[t]he government must also produce 'evidence from which a jury could reasonably infer that the spoke defendant knew about and agreed to join any larger overarching conspiracy.'" Id. at 45; see Kemp, 500 F.3d at 291; United States v. Fernandez, 892 F.2d 976, 986 (5th Cir. 1989).

To determine whether a defendant knew about and agreed to join a single, broad conspiracy, we look to three factors: "(1) the existence of a common goal, (2) overlap among the activities' participants, and (3) interdependence among the participants." United States v. Ciresi, 697 F.3d 19, 26 (1st Cir. 2012); see United States v. Abdelaziz, 68 F.4th 1, 42 (1st Cir. 2023). "[A]n

_____

argument is therefore waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

agreement to conspire may be express or tacit and can be proven using direct or circumstantial evidence." Abdelaziz, 68 F.4th at 43 (citing United States v. Glenn, 828 F.2d 855, 857-58 (1st Cir. 1987)). But such an agreement requires, at a minimum, that the spokes know the other spokes are spokes. See Monserrate-Valentín, 729 F.3d at 44-45; United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011) ("[I]t is therefore essential to determine what kind of agreement or understanding existed as to each defendant.") (alteration in original) (citation omitted); Glenn, 828 F.2d at 857 (finding a "tacit agreement" between a drug distributor and a "distant supplier," like a smuggler, can exist "at least when the distributor knows that the smuggler probably exists, that distributing drugs tends to help the smuggler, and that the smuggler's contribution to the success of the entire enterprise is likely needed if the distributor is to achieve his own more immediate objective"); see also United States v. Chandler, 388 F.3d 796, 806 (11th Cir. 2004) ("Since no one can be said to have agreed to a conspiracy that they do not know exists, proof of knowledge of the overall scheme is critical to a finding of conspiratorial intent.").

The parties agree that Count One alleges a hub-and-spoke conspiracy with Hernández at the hub of a wheel that has two spokes, one involving Ivonne and Barreto, and the other involving López. Ivonne contends that, even if the evidence were sufficient

- 35 -

to support the conclusion that she and López were spokes on such a wheel with Hernández at the center, such that Ivonne and López each conspired individually with Hernández to commit honest services wire fraud or federal program bribery, the evidence does not support the conclusion that Ivonne knew about and agreed to join the broader conspiracy alleged under Count One insofar as it encompassed not only Ivonne but also López. We agree.

The record contains no evidence -- and the government identifies none -- that López had any involvement whatsoever in the 3CG scheme, let alone an unlawful one. That scheme alleged only that Ivonne agreed to take official acts with respect to the 3CG purchasing-website proposal in exchange for the stream of benefits from Hernández.

Insofar as the evidence pertaining to the IAMC payment scheme suffices to support Ivonne's conviction under § 371 -- a proposition on which we decline to rule -- the record also contains no evidence that López had any involvement in that scheme. That scheme allegedly involved Ivonne's efforts, at Hernández's request, to have employees within AAA issue payments to IAMC. But the government does not dispute that there is no evidence that López ever assisted with that scheme or even communicated with Ivonne or anyone else about that scheme. Thus, here, too, the evidence pertaining to this scheme does not suffice to show that

the conspiracy in which Ivonne participated was as broad as the conspiracy charged in Count One.

Moreover, for the reasons described above, the evidence pertaining to the job-fair scheme cannot support Ivonne's conviction under § 371. Thus, we need not consider whether the evidence pertaining to the job fair suffices to show that Ivonne knew that López was engaged in a conspiracy with respect to that scheme.

That leaves the WIA-funded job training scheme. But insofar as the evidence regarding that scheme suffices to support Ivonne's conviction for conspiracy to commit honest services wire fraud under § 371 -- a proposition on which we also decline to rule -- the record does not support the conclusion that Ivonne and López conspired in the requisite sense with respect to that scheme.

It is true that the evidence pertaining to that scheme supports the conclusion that, while receiving a stream of benefits from Hernández, Ivonne and López both desired for the WIA-funded job training contract to be signed; worked together to make that happen; and depended on one another for it to happen, insofar as both AAA and ADL needed to agree on the transfer of WIA funds from ADL to AAA in order for the contract to be possible. But, even if the evidence could support the conclusion that Ivonne and López were each conspiring to commit honest services wire fraud with Hernández by agreeing to take official acts with respect to the

WIA-funded job training scheme in exchange for the stream of benefits that each received, the evidence does not suffice to support a non-speculative inference that Ivonne and López knew that the other was receiving a stream of benefits from Hernández or that the other's interest in advancing the WIA-funded job training scheme was in any way unlawful. Indeed, the record contains no evidence to show that either was even aware that the other was receiving any such benefit from him at all.[10]

Thus, we do not see how a rational jury could find on this record beyond a reasonable doubt that Ivonne knew that López was a spoke in a conspiracy, rather than an official lawfully working on a proposal with another agency official and an outside contractor. And without knowing more than that about López, Ivonne could not have agreed to participate in the broad conspiracy charged involving her.[11] See Monserrate-Valentín, 729 F.3d at 44–45.

---

[10] The government does contend that an invitation to Hernández's birthday party and a Don Omar concert were benefits that were among the "stream of benefits" that Ivonne received from Hernández in exchange for her agreement to take official acts. And the government further alleges that both Ivonne and López attended Hernández's birthday party and that concert. But, insofar as the government means to argue that the mere fact that both Ivonne and López were present at this event supports a non-speculative inference that either knew that the other was receiving a stream of benefits from Hernández and was taking an "official act" in exchange, we disagree.

[11] We note that, in Martínez, we rejected López's sufficiency challenge to her conviction on Count One. Martínez, 994 F.3d at

Thus, insofar as the evidence suffices to convict Ivonne under § 371 at all, such a conviction involved a conspiracy that did not involve all the spokes in the broad conspiracy alleged in the indictment. And so, we agree with Ivonne that a variance arose with respect to Count One, which means we also must address whether Ivonne is right that the variance was prejudicial. See Kotteakos v. United States, 328 U.S. 750, 755-57 (1946).

When a government tries a defendant for a single, overarching conspiracy, "a defendant may suffer from evidentiary spillover, which is the transference of guilt to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved." Monserrate-Valentín, 729 F.3d at 50 (citation and internal quotations omitted).

We agree with Ivonne that such transference could have occurred in the present case. See id. Because the government tried Ivonne for participating in a single, broad conspiracy

9-11. That challenge focused on the contention that the evidence did not suffice to show that López's actions with respect to the WIA-funded job training scheme were "illegal, or even irregular." Id. at 10. Although López also argued that there was no evidence "she was even aware of" the schemes involving 3CG and the IAMC payments, López did not challenge her conviction on Count One on the ground that she also did not know Ivonne was engaged in an unlawful quid-pro-quo involving the WIA-funded job training scheme and thus that López could not have entered into a broad conspiracy with Ivonne involving the WIA-funded job training scheme. Id. at 10-11. Therefore, in rejecting López's challenge to Count One, we had no reason to decide that latter issue.

involving López, the jury that convicted Ivonne was exposed to evidence regarding López's awarding of government contracts to Hernández's companies; expensive gifts and champagne lunches that Hernández and his associates allegedly bestowed upon López; Hernández's efforts to have López confirmed as head of ADL; and criticism of López's dealings with Hernández by a former ADL employee. Moreover, the government presented the evidence against Ivonne and López in chronological order rather than presenting the case against each defendant separately. Cf. Kemp, 500 F.3d at 292 (finding no effect on defendant's substantial rights where the government "rigorously segmented its proofs" and "the presentation against the defendants . . . proceeded seriatim") (citation omitted). Such evidence presented as it was could have prejudiced Ivonne.

The government's argument to the contrary is not persuasive. The government contends that any "evidentiary spillover" is not an issue where, as here, "ample evidence was presented against each individual defendant based on each defendant's actions and statements." United States v. Brandon, 17 F.3d 409, 450-51 (1st Cir. 1994). But the evidence presented by the government that Ivonne committed conspiracy to commit honest services wire fraud under Count One included only circumstantial evidence about a limited stream of benefits bestowed on Ivonne by Hernández during the same period that Ivonne allegedly took a

series of actions that benefitted Hernández and his associates. While this evidence is sufficient to support Ivonne's conviction under Count One, it is not sufficiently "ample" to eliminate the risk that the jury based its conviction of Ivonne on evidence of an unrelated offense. See id.

Moreover, although the government is right that the Supreme Court has found before that charging defendants with a single, broad conspiracy involving the "joinder of two conspiracies" can be harmless error, the Court did so based on the "circumstances of [the] case" before it and expressly declined to rule on how such a variance would affect a "different case." See Berger v. United States, 295 U.S. 78, 83-84 (1935); see also Kotteakos, 328 U.S. at 766. And here, in light of the extensive evidence presented against López in a way that did not clearly delineate between the evidence against López and the evidence against Ivonne, we find that the presentation of evidence against López was prejudicial to Ivonne. We thus find that Ivonne's conviction for conspiracy to commit honest services wire fraud under Count One of the indictment could only have been based on a narrower conspiracy than the one charged and trying her for the broader conspiracy was prejudicial. See Kotteakos, 328 U.S. at 755-57.

**3.**

We next turn to Ivonne's challenge to the sufficiency of the evidence supporting her conviction on Count Six. Under this count, the indictment stated that Ivonne, Hernández, and Barreto

> did knowingly combine, conspire, confederate, and agree with each other and others . . . to devise and intend to devise a scheme and artifice to defraud and deprive the United States and the citizens of Puerto Rico of the honest services from public officials [Barreto] and [Ivonne], in violation of [§ 1349].

The indictment also "re-alleged and incorporated" the allegations contained in Count One of the indictment.

Ivonne does not contest that the evidence suffices to support her conviction on Count Six if the evidence suffices to show that she conspired with the others named in the conspiracy to carry out any of the underlying schemes involving federal program bribery or honest services wire fraud. But she contends there was no such evidence. She argues that the evidence did not support the conclusion that she "knew of the existence of the conspiracy, that she agreed to participate in it, or that she intended to commit honest services fraud or federal program bribery." See Bristol-Mártir, 570 F.3d at 39.

As support for this argument, Ivonne draws on her challenges to the underlying substantive offenses. She contends that because the evidence does not suffice to show that she engaged

in any unlawful quid-pro-quo or took an "official act" with respect to any of the fraudulent schemes alleged in the indictment, the evidence does not suffice to show that she "knew of" or "agreed to participate in" any conspiracy or had the requisite intent with respect to the substantive offenses underlying it.

But, for the reasons we have already described, the evidence pertaining to the 3CG purchasing-website proposal suffices to show that Ivonne intended to commit honest services wire fraud and that she knew of and agreed to participate in a conspiracy with Hernández and Barreto in order to do so. See Bristol-Mártir, 570 F.3d at 39; Lanza-Vázquez, 799 F.3d at 146; Floyd, 740 F.3d at 28. And Ivonne does not dispute that, insofar as the evidence suffices to show that she conspired with Hernández and Barreto to commit honest services wire fraud, the evidence also sufficed to convict her on Count Six. We thus conclude that the evidence sufficed to convict Ivonne of conspiracy to commit honest services wire fraud under § 1349 and accordingly decline to reverse her conviction on Count Six.

**D.**

We turn finally to Ivonne and Marielis's challenges to the sufficiency of the evidence supporting their convictions under Count Seventeen for "aid[ing] and abet[ing] each other" in the commission of extortion, in violation of "18 [U.S.C.] Section 1951(a) and 2." Reviewing these challenges de novo, see

- 43 -

Millán-Machuca, 991 F.3d at 17, we conclude that the evidence was sufficient to support Marielis's conviction on Count Seventeen, but not Ivonne's.

To convict a defendant of aiding and abetting extortion, the government must prove that a "principal committed" extortion and that the defendant "associated [her]self with the venture, participated in it as something [s]he wished to bring about, and sought by h[er] actions to make it succeed." United States v. Loder, 23 F.3d 586, 590-91 (1st Cir. 1994) (citation omitted). A defendant is guilty of extortion if she "obtain[ed] . . . property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "With respect to the use of fear, '[w]hat is required is evidence that the defendant knowingly and willfully created or instilled fear, or used or exploited existing fear with the specific purpose of inducing another to part with property.'" United States v. Burhoe, 871 F.3d 1, 9 (1st Cir. 2017) (quoting United States v. Coppola, 671 F.3d 220, 241 (2d Cir. 2012)).

The indictment charged specifically that "[Ivonne] utilized her position at AAA in order to enable her sister, [Marielis], to obtain property not due to [Marielis], . . . induced through the wrongful use of a fear of economic loss." On this

score, the parties do not dispute that the evidence put forth by the government supports the following factual conclusions.

First, Marielis met Crespo in the mid-1990s, while Marielis was working in the same building as Crespo's mother, whom she also knew. In 2012, Crespo ran into Marielis, and they started talking. While they were talking, Crespo mentioned to Marielis that he did contracted work for AAA and sometimes he got paid quickly for that work but sometimes it took a while for him to get paid. Marielis asked Crespo if he knew who was responsible for issuing the AAA payments, and Crespo responded that Ivonne was responsible. Marielis then told Crespo that Ivonne was her sister.

Crespo later did work for Marielis on some apartments she owned and told her she owed him roughly $2,500.[12] Marielis responded by making a call in front of Crespo to someone she referred to as "Bonsi." Marielis told "Bonsi" that Marielis knew Crespo's mother and "asked if [IAMC's] check could be issued." Marielis then told Crespo that they were "squared off" such that, in exchange for the issuance of the money he was owed by AAA, he could no longer invoice her for the work he had done on her apartments. Crespo testified that at this point, he thought he

_____

[12] The District Court stated that the amount was $20,000, but at trial Crespo said that the amount was roughly "2,500, 2,450 dollars." He explained that "[i]t was 2,000 for the guys, and the incinerator, well, they charged 450, 500 dollars for you to dump it there."

was "screwed" because if she had "the power to issue a check in five minutes, [she] also ha[d] the power to stop it."

Soon after this phone call, Marielis began telling Crespo weekly to go pick up payments from AAA. Marielis met him at the bank where he went to pick up the check and said to him "you know, talking as a friend . . . you see how we . . . deal with this and how we can help with this. And for this, five or ten percent is collected to do this." Crespo testified that he interpreted this statement to mean that Marielis was demanding payment for her "expedit[ing] the payment of the [AAA] checks." Crespo paid Marielis what she requested, thinking "if you can issue the check, you can stop the check." He testified that he "was afraid that [his] payments . . . would stop" if he did not pay.

Crespo continued to pay Marielis each time he collected the expedited AAA payments. When Crespo paid Marielis $2,000 instead of the $7,000 that she demanded, he did not receive a check for almost a month. He then called Marielis and paid the balance.

Within AAA, Ivonne "played an active role" in expediting AAA's payments to IAMC. She contacted and ordered AAA staff members on numerous occasions to review IAMC invoices, find funding, and pay IAMC, and she followed up when the payments were not made in sufficient amounts. She also demanded that such payments be made quickly. During the period that AAA was expediting IAMC's payment, cash deposits totaling tens of

thousands of dollars appeared in both Marielis's and Ivonne's bank accounts.

The government contends that this evidence supports Marielis's conviction on Count Seventeen because the evidence supports the conclusion that Marielis induced in Crespo the fear of delayed, reduced, and absent payments in exchange for Crespo's cancellation of Marielis's debt to him and in exchange for a percentage of his AAA payments. The government contends that the evidence presented at trial supports Ivonne's conviction on Count Seventeen because the evidence supports the conclusion that Ivonne aided and abetted Marielis in using such fear to obtain such property from Crespo.

Ivonne and Marielis respond that the evidence is not sufficient to support the conclusion that Marielis used a "fear" of "economic loss" to obtain property from Crespo. On this score, they first argue that not receiving a payment in advance of the normal time the payment would otherwise be issued is not an "economic loss" but merely the absence of a potential benefit. Thus, they contend, even if Marielis had instilled in Crespo a fear that he would not receive early payments if he did not pay her, such a fear was not a fear of economic "loss." And, they argue, the evidence does not support the conclusion that Marielis instilled in Crespo the fear of anything other than the absence of early payments.

Even if we agreed with Marielis that the absence of an early payment was not an economic "loss," see United States v. Rivera Rangel, 396 F.3d 476, 483 (1st Cir. 2005) ("[T]he loss feared must be 'a particular economic loss, not merely the loss of a potential benefit.'" (citation omitted)); United States v. Capo, 817 F.2d 947, 951 (2d Cir. 1987) (en banc), the evidence was sufficient to support the conclusion that Marielis used Crespo's reasonable fear of delayed, reduced, or cancelled payments to secure his property. In particular, the evidence was sufficient to support the conclusion that -- though Crespo had never asked Marielis to help expedite his payments or help him in any other way with his AAA payments -- Marielis called "Bonsi" in front of Crespo, asked for Crespo's AAA money to be paid, and then told Crespo he could no longer charge Marielis the roughly $2,500 she owed him. Marielis's demonstration of influence in this regard, which was not tied to a specific request from Crespo, supports a finding by a rational jury that Marielis intended to communicate to Crespo that she controlled his payments -- including their issuing on time and in the full amount -- and that a fear on Crespo's part that Marielis would have his AAA payments delayed, reduced, or cancelled was reasonable.[13]   See Rivera Rangel, 396

----

[13] This case is distinguishable from the Second Circuit's ruling in Capo.  There, the Second Circuit held that the evidence

- 48 -

F.3d at 483. And Crespo's delayed, reduced, or cancelled payments would constitute an "economic loss" under our precedents. See United States v. Vázquez-Botet, 532 F.3d 37, 61 (1st Cir. 2008) (holding that economic losses can include "delay[ed]" payments for contracted work); United States v. Hathaway, 534 F.2d 386, 395 & n.6 (1st Cir. 1976) ("[A] narrow perception of . . . economic loss is misdirected. . . . The proper focus . . . is whether the victim's interest, economic or otherwise, was sufficient to give rise to fear.").

---

was not sufficient to support the defendants' extortion convictions, which were based on the defendants' bypassing of hiring procedures in order to give preferential treatment to job candidates who paid the defendants. Capo, 817 F.3d at 949-51. Unlike Ivonne and Marielis, however, the alleged extortion victims came to the defendants in search of preferential treatment, and the defendants did not make a show of their influence and demand payment in the way that Marielis did with Crespo. Id. And, unlike Crespo, those who paid the defendants in Capo testified that they did not fear adverse consequences if they did not pay. Id. at 952. Thus, in Capo, a rational jury could have concluded only that the people who paid the defendants for jobs were "willing participants seeking to improve their chances" of obtaining jobs, id., whereas in the present case, a jury could have found that Marielis's debt was cancelled because Crespo feared unusually delayed, reduced, or cancelled payments.

This case is also distinguishable from United States v. Garcia, 907 F.2d 380 (2d Cir. 1990). There, the Second Circuit reversed an extortion conviction of a congressman who pressured an officer at a corporation to hire his wife in exchange for help with the corporation's government contracts. Id. at 382-83. But in Garcia, the officer did not testify that he perceived anything the congressman said to him as a threat to cause economic loss, rather than merely the withholding of preferential treatment with respect to the government contracts of the officer's corporation. Id. at 383-84.

Marielis challenges the conclusion that she used a fear of "economic loss" in the form of delayed, reduced, or cancelled payments by contending that Crespo never told her "that his business would suffer any hardship for late or lack of payments" and that the record does not "show that Marielis had any reason to believe that Crespo had any economic fear in that regard." Specifically, she argues, Crespo did not tell her "about IAMC['s] need to collect from AAA to be able to pay his employees and suppliers."

To the extent Marielis is contending that she did not know that Crespo feared an "economic loss" because she did not know the specific impact that "late or lack of payments" would have on Crespo, we are not persuaded. For Marielis to "use" the fear of "economic loss" to secure property from Crespo, she need not be aware that Crespo would suffer "hardship" from the loss, nor need she be aware of exactly how the loss would impact IAMC or how extensive the loss would be. See Hathaway, 534 F.2d at 395 & n.6. Rather, she need only have used Crespo's reasonable fear of some economic loss to secure Crespo's property. See id.; Rivera Rangel, 396 F.3d at 483. And, to the extent Marielis means to assert that she did not know Crespo would have the requisite "economic fear" given that she did not know of the hardship he would suffer, a reasonable jury could have inferred that Marielis did know of and use that fear in light of the evidence of her show

- 50 -

of influence over Crespo's payments and his subsequent relinquishing of his property.

Ivonne's conviction on Count Seventeen, however, requires reversal. For Ivonne to have "associated [her]self with [Marielis's extortion] venture, participated in it as something [s]he wished to bring about, and sought by h[er] actions to make it succeed," see Loder, 23 F.3d at 590-91, she needs to have been aware that it was occurring. That means that she needs to have been aware that Marielis was using a "fear" of "economic loss" to obtain property from Crespo.

But the evidence in the record is not sufficient to support such a conclusion beyond a reasonable doubt. That is so even if the record could support the conclusion that the person Marielis referred to as "Bonsi" on the phone was Ivonne -- given that name's similarity to "Bonnie," the nickname for Ivonne identified in the Presentence Investigation Report -- and that Ivonne instructed AAA employees to issue IAMC's payments quickly. Such evidence, on its own, suffices to show only that Ivonne knew that Marielis wanted the payments issued because, as Marielis allegedly said on the phone to "Bonsi," Marielis "knew Crespo's mother." Such evidence does not show that Ivonne knew that Marielis made that call in front of Crespo or made any other show of influence in front of him. Thus, such evidence, on its own, does not suffice to support the conclusion that Ivonne was aware

that Marielis was inducing "fear" of "economic loss" in Crespo to obtain his property.  See Guzman-Ortiz, 975 F.3d at 55.

Moreover, the evidence in the record is not sufficient to tie to Crespo the cash deposits allegedly placed in Ivonne's bank account during the time when Marielis was allegedly extorting Crespo.  This is so even though the evidence supports the conclusion that Ivonne made eight cash deposits in two different accounts over the course of a month while Marielis was allegedly extorting Crespo; that Ivonne and Marielis sometimes made these deposits "on the same day at the same branch" or "at different branches on the same day;" and that the cash deposits were sometimes "made by the same account holder at different branches on the same day."  Indeed, even if such evidence were sufficient to support the conclusion that Ivonne and Marielis were attempting to obscure the source of these funds, this evidence does not suffice to tie these funds to Crespo.

But even if the evidence regarding the cash deposits did somehow suffice to support the inference that these deposits were from Crespo, such a conclusion still would not suffice to support the further conclusion that Ivonne was aware that these funds were provided to her and Marielis because Crespo feared an "economic loss" if he did not pay them.  Indeed, to come to such a conclusion would require inferring that Ivonne knew that Crespo provided the money; that he did so in response to the issuance of his AAA

payments; and that that response was out of fear of "economic loss" in the form of the absence of such payments. But such inference stacking does not suffice to support a conclusion beyond a reasonable doubt. See id.; Abdelaziz, 68 F.4th at 50.

Without evidence sufficing to support the conclusion that Ivonne was aware that Marielis was "us[ing]" "fear" of "economic loss" to obtain Crespo's property, Ivonne could not have been aware that an extortion was taking place. See Loder, 23 F.3d at 590-91. Thus, we reverse Ivonne's conviction on Count Seventeen but decline to reverse Marielis's.

## IV.

For the foregoing reasons, we **vacate in part** and **reverse in part**.