# United States Court of Appeals
## For the First Circuit

No. 25-1126

UNITED STATES,

Appellee,

v.

STAVROS PAPANTONIADIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Rikelman, Circuit Judges.

Martin G. Weinberg, with whom Kimberly Homan was on brief, for appellant.

Randall E. Kromm, Assistant United States Attorney, with whom Leah B. Foley, United States Attorney, was on brief, for appellee.

January 21, 2026

**RIKELMAN, Circuit Judge**. After a ten-day trial, a jury convicted Stavros Papantoniadis, the owner of a chain of pizzerias in Massachusetts, of six counts of forced labor and attempted forced labor in violation of 18 U.S.C. §§ 1589(a) and 1594(a). The district court then sentenced him to 102 months in prison. Papantoniadis now appeals both his convictions and sentence. He challenges (1) the sufficiency of the evidence against him, as well as the district court's (2) evidentiary rulings, (3) sentencing calculations, and (4) denial of his requests for a longer continuance and a new trial. Finding no reversible error, we affirm.

## I. BACKGROUND

### A. Relevant Facts

Because Papantoniadis challenges the sufficiency of the government's evidence against him, "[w]e recount the relevant facts as presented at trial in the light most favorable to the jury's verdict, consistent with record support." United States v. Coleman, 149 F.4th 1, 12 (1st Cir. 2025) (alteration in original) (internal quotation marks omitted) (quoting United States v. Katana, 94 F.4th 521, 525 (1st Cir. 2024)). In evaluating Papantoniadis's other claims on appeal, however, including his challenges to certain evidentiary rulings, "we offer a balanced treatment, in which we objectively view the evidence of record." Id. (quoting United States v. Greaux-Gomez, 52 F.4th 426, 430 (1st

Cir. 2022)). "Because we cannot simultaneously recite the facts in both manners, we limit our initial summary . . . to those [facts] essential to framing the issues on appeal, and provide additional details later in our analysis, as needed." Id. (omission in original) (internal quotation marks omitted) (quoting Greaux-Gomez, 52 F.4th at 430).

Papantoniadis owned a group of pizzerias, mainly known as "Stash's," throughout Massachusetts. He was responsible for hiring, paying, and determining the schedules of his employees.

Within the immigrant community, Papantoniadis was known for actively recruiting and hiring undocumented workers. He often hired undocumented immigrants who spoke little to no English to work at the back of Stash's, most often in the kitchen. By contrast, the employees who worked up front, including cashiers, were primarily native English speakers with legal status in the United States. Although generally a demanding and quick-tempered boss, Papantoniadis treated the employees in the back in a noticeably worse manner than he treated his other employees. A former cashier testified that Papantoniadis would often yell at the employees in the back, who "work[ed] extraneous hours" and "wouldn't get proper breaks."

Seven former employees of Stash's who were undocumented immigrants and served as kitchen staff testified at Papantoniadis's trial. They worked primarily in the Norwood and

Roslindale locations.  None were authorized to work in the United States at the time they were employed by Stash's.

Collectively, the seven former employees testified that Papantoniadis was a frightening boss who surveilled them during their shifts via video camera, rebuked and yelled at them, assaulted several of them and their coworkers, and threatened them with deportation.  See infra Section II.A.2.  For instance, they described an incident when Papantoniadis assaulted and injured one of the employees, Thiago Silva Teixeira, on Teixeira's last day of work.  Another employee, Julio Cesar Yanes Reyes, testified that when he tried to quit, Papantoniadis pursued him in a truck and made a gesture with his wrists crossed that Yanes interpreted as signaling that Papantoniadis would have him arrested.  The employees also testified that Papantoniadis required them to work long hours, without breaks or days off, and would often underpay them.  In 2016, the Department of Labor (DOL) investigated Papantoniadis for his compensation practices.

## B. Procedural History

In March 2023, a grand jury charged Papantoniadis with four counts of forced labor and three counts of attempted forced labor.  With the parties' input, the district court eventually set May 20, 2024, as the trial date.

Twelve days before the trial was scheduled to begin, Papantoniadis moved to continue it by over four months, until

- 4 -

September 30, 2024, based on the volume of discovery in the case. The government opposed the motion. The district court granted the motion in part and denied it in part, permitting an eight-day continuance until May 28, 2024. Nonetheless, jury selection still occurred as scheduled on May 20, 2024.

After a ten-day trial, the jury found Papantoniadis guilty of six of the seven counts charged in the indictment. Papantoniadis then moved for a new trial based on alleged discovery violations by the government and the district court's partial denial of his motion for a continuance. The district court denied his motion.

The district court ultimately sentenced Papantoniadis to 102 months in prison and one year of supervised release for each count, to be served concurrently.

Papantoniadis timely appealed.

## II. DISCUSSION

Papantoniadis raises several challenges on appeal. First, he maintains that the evidence was insufficient to support his convictions on five of the six counts. Second, he contests three of the district court's evidentiary rulings. Third, he challenges his sentence as procedurally unreasonable based on what he contends were erroneous sentencing enhancements. Fourth, he argues that the district court abused its discretion in denying

- 5 -

him a longer continuance and in denying his request for a new trial. As we explain below, we reject each of his challenges.

## A. Sufficiency of the Evidence

Before turning to the merits of Papantoniadis's challenge to the sufficiency of the evidence against him, we address whether he preserved this claim for appeal and, thus, which standard of review applies.

After the government rested its case at trial, Papantoniadis moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), contending that the government had not met its burden of proof. The district court denied his motion, and Papantoniadis then confirmed that he would not present any evidence of his own. The next day, Papantoniadis formally rested his case. He did not renew his Rule 29 motion before closing arguments, nor did he renew his motion after the jury returned its verdict. See Fed. R. Crim. P. 29(c)(1). According to the government, Papantoniadis's failure to renew his motion at either point resulted in waiver of his sufficiency challenge. For his part, Papantoniadis maintains that he did not need to renew the motion given that the defense decided not to put on any evidence.

We agree with Papantoniadis that he preserved his sufficiency claim. As we have held, a Rule 29 motion at the close of the government's case is enough to preserve a sufficiency challenge if the defendant does not present any evidence. See

United States v. Acevedo, 882 F.3d 251, 258 n.6 (1st Cir. 2018); United States v. Hernández, 218 F.3d 58, 63 n.3 (1st Cir. 2000); see also United States v. Rivera-Ortiz, 14 F.4th 91, 98 (1st Cir. 2021) (explaining that "it is the 'combine[d]' omission of a proper pre- and post-verdict motion for acquittal that constitutes waiver" (alteration in original) (emphasis added) (quoting United States v. Maldonado-García, 446 F.3d 227, 230 (1st Cir. 2006))).

We review a preserved sufficiency claim de novo. See Coleman, 149 F.4th at 42 (citing United States v. Falcón-Nieves, 79 F.4th 116, 123-24 (1st Cir. 2023)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (alteration in original) (quoting Falcón-Nieves, 79 F.4th at 123). In undertaking this analysis, "[w]e consider the evidence as a whole." United States v. Cedeño-Pérez, 579 F.3d 54, 58 (1st Cir. 2009) (citing United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998)). If the evidence "viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, [we] must reverse the conviction." Coleman, 149 F.4th at 42 (quoting Morillo, 158 F.3d at 22). This is so because "a reasonable jury must necessarily entertain a reasonable doubt"

when such circumstances exist.  Id. (quoting Morillo, 158 F.3d at 22).

## 1. The Charged Offenses

To put the trial evidence in context, we review the elements of the charged offenses -- forced labor and attempted forced labor.  The forced labor statute makes it illegal to "knowingly . . . obtain[] the labor or services of a person by any one of" four prohibited means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a).

Under the forced labor statute, "serious harm" is:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

- 8 -

Id. § 1589(c)(2). We have read the phrase "serious harm" to "extend[] to non-physical coercion." United States v. Bradley, 390 F.3d 145, 151 (1st Cir. 2004), vacated on other grounds, 545 U.S. 1101 (2005). Nonphysical coercion may include threats of deportation. See United States v. Chaudhri, 134 F.4th 166, 186-87 (4th Cir. 2025) (treating the threat of deportation as a serious harm).

Additionally, the forced labor statute defines "abuse or threatened abuse of law or legal process" as:

> [T]he use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. § 1589(c)(1).

Consistent with the forced labor statute, the district court instructed the jury that a guilty verdict required proof beyond a reasonable doubt that Papantoniadis "obtained the labor of the victim . . . through at least one of the [four] prohibited means" and that he "acted knowingly" in doing so. The court clarified that the jury "need not unanimously agree on which, if any, of the four terms of prohibited means was used, as long as [the jury] agree[d] that at least one of them was used." The court further instructed the jury to determine whether the use of prohibited means "was sufficient to cause the victim to reasonably

- 9 -

believe that he or she had to work (or to remain working) to avoid a use of force, a threat of force, serious harm, or an abuse of . . . law or legal process." Papantoniadis does not contest these instructions on appeal.

Moving to the attempted forced labor charge, the government needed to prove that Papantoniadis "intended to commit the substantive offense" -- forced labor -- and that "he took a substantial step toward its commission." United States v. Concepcion-Guliam, 62 F.4th 26, 33 (1st Cir. 2023) (quoting United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006)). There is no dispute here that the district court instructed the jury accordingly.

**2. Sufficiency Challenges**

With this legal framework set out, we turn to evaluating Papantoniadis's sufficiency arguments. He contends that the evidence was insufficient for the jury to convict him on five of the six counts. Specifically, he challenges his convictions on counts 2, 3, 4, 5, and 7 (but not 6):

| Count | Employee[1] | Charge | Verdict | Sufficiency Challenge? |
|---|---|---|---|---|
| 1 | Mamdouh Elkashilan | Forced Labor | Not Guilty | – |
| 2 | Jose Antonio Hernandez Navarette | Forced Labor | Guilty | Yes |
| 3 | Tharcisio Ribeiro do Carmo | Forced Labor | Guilty | Yes |
| 4 | Silvia Bonilla Villorio | Forced Labor | Guilty | Yes |
| 5 | Thiago Silva Teixeira | Attempted Forced Labor | Guilty | Yes |
| 6 | William dos Passos | Attempted Forced Labor | Guilty | No |
| 7 | Julio Cesar Yanes Reyes | Attempted Forced Labor | Guilty | Yes |

Papantoniadis makes three overarching arguments as part of his sufficiency challenge.  First, he claims that the government did not prove causation, because it did not establish that his conduct "actually caused the employee[s] to remain in his employ against their will."  According to Papantoniadis, the evidence demonstrated only that he was a "demanding boss when he felt employees were not working up to his standards," not someone who

---

[1] We follow the parties' lead and refer to the employees for counts 2 through 7 as Hernandez, do Carmo, Bonilla, Teixeira, Passos, and Yanes.

illegally coerced his workers' labor.  Second, he claims that what transpired on certain employees' last days of work reflected only his reaction to their plans to quit and was not evidence of his attempt to force them to remain employed.  Third, Papantoniadis contends that this case is too far afield from Bradley, 390 F.3d 145, the other forced labor case decided by our court.  He argues that the forced labor statute was designed to prohibit a type of involuntary servitude; that the defendants in Bradley imposed severe conditions on their employees akin to involuntary servitude; and that, by comparison, his own conduct proved at trial was qualitatively different and thus cannot, as a legal matter, amount to forced labor.

Considering the record as a whole, we agree with the government that there was sufficient evidence for a rational jury to accept its theory of the case and convict Papantoniadis.  That is, the jury could have found beyond a reasonable doubt that Papantoniadis sought out undocumented immigrants as employees so that he could intimidate them into working long hours under difficult conditions and, thereafter, intentionally caused them to fear that if they left, he would retaliate against them.  In arguing to the contrary, Papantoniadis applies a too narrow lens in his framing of the facts. As the government observes, he takes a "divide-and-conquer approach," suggesting that the jury could consider only his conduct directed at a specific employee when

- 12 -

evaluating his liability as to that count. But the jury was entitled to consider the evidence in its entirety and draw reasonable inferences from it. See Cedeño-Pérez, 579 F.3d at 58.

As we observed in Bradley, "the defendants' prior treatment of [former employees] . . . tended to reinforce the inference that the later, similar treatment of [other employees] was part of a deliberate scheme to hold laborers by intimidation." 390 F.3d at 155. The district court here instructed the jury accordingly, explaining that "the crime of forced labor requires that there be a specific identified victim" but that the jury could "consider the entire factual context, including a workplace with multiple employees, some of whom . . . could be victims, some not." (Emphasis added.) Based on the entire factual context, a rational jury could have found that Papantoniadis intentionally "created a climate of fear and violence through repeated physical abuse and threats of deportation" so that his workers would remain in his employ. Chaudhri, 134 F.4th at 187.

Finally, nothing in Bradley suggests that only facts similar to those posed in that case are sufficient to permit a conviction under the forced labor statute. Instead, the focus must be on the evidence in this case and how it maps onto the statutory requirements.

Thus, we reject Papantoniadis's overarching arguments and proceed to analyze the sufficiency of the evidence count by

count, summarizing the individual testimonies of the five employees while considering the evidence as a whole. To that end, we note that the jury was permitted to consider Passos's testimony, which Papantoniadis does not challenge in any respect, in reaching its verdicts on the other counts. At trial, Passos testified that he felt forced to continue working at Stash's because Papantoniadis (1) threatened him with deportation if he quit, (2) told Passos he had killed someone, and (3) threw a pan at him in anger.

Further, to the extent Papantoniadis argues that a conviction under the forced labor statute requires proof that he "intentionally coerc[ed] (or attempt[ed] to coerce) the employees at issue to remain in his employ," a rational jury could infer that intent from evidence that he acted knowingly. See, e.g., United States v. Pagán-Romero, 894 F.3d 441, 444-45 (1st Cir. 2018) (accepting a trial court's instruction to the jury that they could "infer . . . that a person intends the natural and probable consequences of his acts knowingly done or knowingly admitted"). Indeed, Papantoniadis concedes this point in his reply brief.

We start with the attempted forced labor counts (counts 5 and 7), and specifically count 5 as to Teixeira, because several other employees testified at trial about their observations of Teixeira's interactions with Papantoniadis. We then proceed numerically through the forced labor counts (counts 2, 3, and 4).

- 14 -

### i. Count 5: Attempted Forced Labor as to Teixeira

Teixeira came to the United States from Brazil in 2012 and overstayed his tourist visa. Hired without work authorization, he toiled long hours at Stash's and did not receive days off. He viewed Papantoniadis as "intimidating" because Papantoniadis often yelled at employees.

In August 2013, Teixeira gave notice to Papantoniadis that he had found a new job but also agreed to help train his replacement. Once his replacement came on board and settled in, Teixeira began leaving Stash's earlier so that he could report to his new position. Papantoniadis then confronted Teixeira about what he viewed as Teixeira's early departures. When Teixeira responded that he could not ignore his new job, Papantoniadis insisted, "You cannot leave. I already gave you the [pay] increase." Papantoniadis then began yelling, referring to Teixeira as a "[m]otherfucker pizza guy." After Teixeira insisted that Papantoniadis "respect [him]," Papantoniadis grabbed Teixeira's shirt, tearing it and leaving a mark on Teixeira's neck. As Teixeira backed away, Papantoniadis continued to grab him, injuring Teixeira's wrist. Teixeira briefly grabbed a knife, then put it down and ran out the back door of the pizzeria. Papantoniadis followed him, yelling, "[S]tupid immigrant."

After leaving Stash's, Teixeira asked someone to call the police, explaining that his employer had assaulted him. Once

the police arrived, the officers spoke with Papantoniadis, who reported that Teixeira had attacked him. The police then told Teixeira to leave and that he was no longer welcome at Stash's. Later that day, Teixeira went to a hospital, where medical staff documented his injuries. Ultimately, Papantoniadis withheld Teixeira's final paycheck, telling him that he would have to go to small claims court to receive it.

A rational jury could conclude beyond a reasonable doubt that Papantoniadis committed the crime of attempted forced labor as to Teixeira. The evidence was sufficient for the jury to find that Papantoniadis intended to obtain Teixeira's labor through at least one of the prohibited means and that he took a substantial step towards committing that crime. Importantly, Papantoniadis does not dispute that he used physical force -- one of the prohibited means under § 1589(a)(1) -- on Teixeira's last day. Rather, Papantoniadis merely repeats that his conduct was "more consistent with a quick-tempered employer reacting angrily toward an employee who had confronted him," than with an employer attempting to obtain additional labor by physical force. But, in making this argument, Papantoniadis ignores Teixeira's testimony that Papantoniadis said, "You cannot leave." A rational jury could infer from this exchange, and from Papantoniadis's intimidating conduct, that Papantoniadis sought to force Teixeira to continue working. Moreover, medical records and the testimony of other

employees corroborated Teixeira's account of the attack.  Looking at the evidence as a whole, and in the light most favorable to the government, there was sufficient evidence to support the jury's verdict as to Teixeira.

### ii. Count 7: Attempted Forced Labor as to Yanes

Born in El Salvador, Yanes entered the United States without legal authorization in 2013.  After working on a part-time basis at Stash's for several months, Yanes left for a different job.  He then returned to Stash's, working full-time, in 2015.  Papantoniadis frequently yelled at, monitored, and insulted Yanes, calling him a "piece of shit" and making him feel intimidated.

On one occasion, Yanes texted Papantoniadis to request a day off.  Angry that Yanes had texted him at night, Papantoniadis yelled in person, "What do you think I am, your slut?"  Yanes feared Papantoniadis might hit him because he had a "very scary look" and a "very, very strong voice."  As a result, Yanes quit and drove away.  Papantoniadis pursued him in a pickup truck, making Yanes worried that Papantoniadis would hit him with the truck.  Papantoniadis also recorded Yanes with his phone and made a gesture with his wrists crossed, which Yanes understood to mean that Papantoniadis would have him arrested.  The police later pulled Yanes over after Papantoniadis falsely reported that Yanes had left the scene of an accident.

Based on the evidence as a whole, a rational jury could conclude beyond a reasonable doubt that Papantoniadis committed the crime of attempted forced labor as to Yanes. Viewing the facts in the light most favorable to the government, a rational jury could find that Papantoniadis intended to coerce Yanes's labor and took a substantial step towards commission of that crime when he pursued Yanes and made a threatening crossed-arms gesture after Yanes announced that he was quitting. Again, Papantoniadis defends his conduct as that of "a demanding boss trying to run a business." But, in presenting this defense, Papantoniadis disregards Yanes's stated fear that he would hit Yanes with his truck and engineer his arrest. At a minimum, a jury could reasonably infer from this incident that Papantoniadis used "threats of serious harm" or the "threatened abuse of law or legal process" in his attempt to force Yanes to continue working. 18 U.S.C. § 1589(a)(2), (3). Overall, the evidence was sufficient to support the jury's verdict as to Yanes.

### iii. Count 2: Forced Labor as to Hernandez

In 2013, Hernandez came to the United States, without legal authorization, from El Salvador. Shortly after arriving, he started working at Stash's seven days per week, without breaks or regular days off.

Although Hernandez did not see Papantoniadis attack Teixeira, he arrived at the scene shortly afterwards. He observed

- 18 -

that another employee who had been present for the altercation, do Carmo, looked "just white, white in the face." Hernandez felt that "the person [he] was . . . work[ing] for was very angry and a bad person." On a separate occasion, Hernandez saw Papantoniadis grab a kitchen employee and throw that employee against a door. Hernandez was afraid to go to the police because Papantoniadis said that "the police were his friends" and would not listen to undocumented workers.

According to Hernandez, Papantoniadis often told kitchen employees that he could have them deported, which Hernandez believed. Using cameras to surveil him, Papantoniadis called Hernandez to castigate him if he saw that Hernandez was sitting down. Papantoniadis also criticized and yelled at Hernandez, often standing only two to three feet away, which made Hernandez fear that Papantoniadis would strike him. At one point, Hernandez tried to quit and left Stash's. In response, Papantoniadis drove after Hernandez, following him in his car, making Hernandez believe that the car would hit him.

After Papantoniadis and his wife repeatedly called Hernandez to return, Hernandez eventually came back to work and developed painful ingrown toenails in both feet. Although he needed medical care, Papantoniadis denied him time off. Two weeks later, Hernandez went to the emergency room, where a doctor removed one toenail with anesthesia.

After learning that Hernandez found a job at another pizza restaurant and would soon quit his position at Stash's, Papantoniadis told Hernandez that he knew "everybody here . . . [at] all the pizza shops," and had given Hernandez "a good recommendation." When Hernandez reported for work at the other pizza restaurant, however, he was turned away. Hernandez moved to another address, changed his phone number, and did not tell his brother, who also worked at Stash's, where he lived.

On appeal, Papantoniadis contends that his statements about the police and deportation -- to which Hernandez testified -- simply reflected his dissatisfaction with employees' mistakes. But a rational jury could infer that those statements were threats that caused Hernandez to continue working out of fear. At the very least, a jury could rely on that testimony to find that Papantoniadis obtained Hernandez's labor "by means of the abuse or threatened abuse of law or legal process." 18 U.S.C. § 1589(a)(3).

Papantoniadis also points to Hernandez's attempts to quit as proof that Papantoniadis did not force Hernandez to work. But "[t]he fact that [Papantoniadis's] coercive pressures were not indefinitely successful in obtaining . . . labor from [Hernandez] would not preclude a jury from reasonably finding that [they were] initially successful for a significant period of time." Martínez-Rodríguez v. Giles, 31 F.4th 1139, 1156 (9th Cir. 2022).

- 20 -

Looking to the evidence as a whole, a rational jury could find beyond a reasonable doubt that Papantoniadis coerced Hernandez to work for him through one of the means prohibited by the forced labor statute.

### iv. Count 3: Forced Labor as to do Carmo

After coming to the United States from Brazil without legal authorization in 2005, do Carmo began working at Stash's in 2010. No one at Stash's asked do Carmo for documentation showing that he was entitled to work in the country. do Carmo recounted that Papantoniadis had cameras, monitoring the employees "all the time," in the kitchen. On one occasion, Papantoniadis sent do Carmo a picture of him sweeping, with the message, "I see everything."

do Carmo was one of the Stash's employees who witnessed Papantoniadis's attack on Teixeira. According to do Carmo, Papantoniadis punched Teixeira, grabbed him, and said, "Come here, Motherfucker, I'll break you." Papantoniadis also called the police and kept Teixeira's last paycheck and wallet. do Carmo testified to his fear of Papantoniadis, who "was so aggressive because [Teixeira] want[ed] to quit." do Carmo felt that "if [he] want[ed] to quit, that[] [was] going to happen to [him]," too.

do Carmo also testified that when Hernandez quit his job at Stash's, Papantoniadis called Hernandez "not a man" but "a faggot." After learning that Hernandez had contacted the police,

Papantoniadis told do Carmo to "tell [Hernandez] not to fuck with me, I know a lot of people, I have a lot of connections, you're not going to find work near here." do Carmo understood these words to mean that Papantoniadis could harm Hernandez.

According to do Carmo, after Papantoniadis learned that a DOL investigator had asked do Carmo about his work hours and pay, Papantoniadis exclaimed, "Oh, you fucked me, you fucked me." His reaction scared do Carmo. From then on, Papantoniadis commented that he knew do Carmo "d[idn't] have papers," which do Carmo interpreted to mean that Papantoniadis could cause him to "get in trouble" by being deported. Papantoniadis also told do Carmo about Ruben, a former kitchen employee who wanted to quit and was deported, saying, "[S]ee what happened to [Ruben]." do Carmo felt "trapped," like he had "nowhere to go."

After do Carmo tried to quit, Papantoniadis said that do Carmo "ha[d] no balls" and berated him. do Carmo "wanted to leave that day," but he completed his shift after "seeing all what [Papantoniadis had] been doing and saying . . . about [Hernandez] and immigration and deport[ation]." Soon after, Papantoniadis fired do Carmo.

In challenging the sufficiency of the evidence on this count, Papantoniadis attempts to disregard do Carmo's testimony. He argues that it was objectively unreasonable for do Carmo to fear violence from him after the attack on Teixeira, because the

attack was not part of a scheme to coerce do Carmo to work. Drawing all inferences in favor of the verdict, however, we conclude that a rational jury could disagree and find that Papantoniadis intended his conduct to instill fear in do Carmo. After all, Papantoniadis not only attacked Teixeira in front of do Carmo but also made comments to do Carmo that, arguably, threatened to cause do Carmo to be deported if he quit.

Relying on <u>Bradley</u>, Papantoniadis also seeks to minimize the impact of his statements about do Carmo's undocumented status and Ruben's deportation as "permissible warnings of adverse but legitimate consequences." (Quoting <u>Bradley</u>, 390 F.3d at 151.) But a rational jury could have found that these statements were impermissible threats of deportation, amounting either to "threats of serious harm" or the "threatened abuse of law or legal process" under the forced labor statute, or were part of a "scheme" to coerce do Carmo to fear that he might be deported if he quit. 18 U.S.C. § 1589(a)(2)-(4); <u>see</u> <u>United States</u> v. <u>Zhong</u>, 26 F.4th 536, 550 (2d Cir. 2022) ("Whether an employer's threatened consequences are 'legitimate' and therefore do not qualify as 'serious harm' will depend on the 'surrounding circumstances' in each case." (quoting 18 U.S.C. § 1589(c)(2))). Thus, we reject Papantoniadis's sufficiency challenge as to do Carmo.

- 23 -

### v. Count 4: Forced Labor as to Bonilla

Bonilla entered the United States from El Salvador, without legal authorization, in 2003.  In 2013, she started working at Stash's seven days per week, even though she lacked permission to work in the country.  Although she asked for a day off every week, Papantoniadis refused for a year.  Bonilla did not miss a day of work because she feared that she would lose her job, not receive her final paycheck, and Papantoniadis "could call immigration."

On one occasion, when Bonilla confronted Papantoniadis about underpaying her, he said, "I'm here, I'm not going to go anywhere," which she understood to mean that "the one that could go somewhere was [her]."  Papantoniadis also told her that he had "powerful friends" and that "something could happen."  She interpreted his words as implying that he could physically hurt her or have her deported.

Bonilla also witnessed Papantoniadis's attack on Teixeira.  She heard Papantoniadis tell the police that Teixeira tried to kill him.  After the incident, she was "very nervous" and "became afraid of [Papantoniadis]."

Bonilla left Stash's when she became pregnant.  Although she did not intend to return to work, she told Papantoniadis otherwise because she feared his reaction.  She moved to a new address out of fear that he would assault her or have her deported.

Papantoniadis argues that he did not cause Bonilla to work against her will because he did not direct his violent conduct and threats at her. But a rational jury could have found that he knowingly engaged in intimidating behavior that led Bonilla to fear his reaction if she resigned. Again, the jury was entitled to consider evidence of Papantoniadis's conduct directed at other employees, including his attack on Teixeira, at least when viewed in light of Papantoniadis's statements to Bonilla herself. And a rational jury could construe Papantoniadis's comments about having "powerful friends" and that "something could happen" as "threats of serious harm" or the "threatened abuse of law or legal process" against Bonilla. 18 U.S.C. § 1589(a)(2), (3). As a whole, there was sufficient evidence to support the jury's verdict that Papantoniadis obtained Bonilla's labor through means prohibited by the forced labor statute.

In sum, we conclude that the evidence was sufficient to support Papantoniadis's convictions on counts 2, 3, 4, 5, and 7.

## B. Evidentiary Rulings

Papantoniadis also challenges three of the district court's evidentiary rulings. We review the district court's rulings on whether to admit or exclude evidence for an abuse of discretion. See Coleman, 149 F.4th at 28 (citing United States v. Brown, 510 F.3d 57, 66 (1st Cir. 2007)). "[A]n abuse of discretion occurs when a relevant factor deserving of significant weight is

overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." Id. (alteration in original) (quoting Brown, 510 F.3d at 67). We find no reversible error as to any of the challenged rulings.

### 1. Bonilla's Testimony About a Former Employee

To begin, Papantoniadis challenges the district court's ruling admitting Bonilla's testimony about an incident that a coworker described to her. Namely, Bonilla was told that Papantoniadis had hit a former employee who was holding a child in his arms while picking up his final paycheck. Over Papantoniadis's objection, the court allowed the testimony with a limiting instruction, explaining that the jury could consider it only "for the fact it was a comment made to [Bonilla] in the workplace about a prior incident" and "the effect it had on her." The court further explained to the jury that there was "no evidence or proof that the incident actually happened."

Papantoniadis argues that the district court should have excluded Bonilla's testimony as irrelevant. In his view, her testimony on this point would have been relevant only if there were evidence that Papantoniadis intended the incident to have a certain effect on her. Yet, he contends, the incident "was not directed at Bonilla personally and she did not witness it," nor

- 26 -

was it part of a scheme "aimed at causing Bonilla to remain at Stash's against her will."

We conclude, however, that any error in admitting Bonilla's testimony was harmless because it is "highly probable that the error did not influence the verdict." United States v. Turner, 684 F.3d 244, 262 (1st Cir. 2012) (quoting United States v. Casas, 356 F.3d 104, 121 (1st Cir. 2004)). Papantoniadis concedes that multiple employees testified extensively about "other incidents" of Papantoniadis engaging in "verbal and physical abuse" -- so much so that "[t]he government simply did not need [Bonilla's testimony]." Thus, we find no reversible error as to this challenged testimony.

## 2. Bonilla's Testimony About Her Father's Murder

Next, Papantoniadis maintains that the district court erred in admitting, over his objection, Bonilla's testimony about witnessing her father's murder as a child. Shortly after this testimony, however, Bonilla also recounted, without any objection, that seeing Papantoniadis attack Teixeira brought back "all the memories of [her] father's murder," and she feared she would "see the same thing happen again."

Citing Bradley, Papantoniadis argues that the initial portion of Bonilla's testimony to which he did object may have led the jury improperly to "rely upon some hidden emotional flaw or weakness [in Bonilla] unknown to [him]." (Quoting Bradley, 390

- 27 -

F.3d at 153.)  Papantoniadis is right to point out that, in Bradley, we held that only "known objective conditions that make the victim especially vulnerable to pressure (such as youth or immigrant status) bear on whether the employee's labor was obtain[ed] by forbidden means."  390 F.3d at 153 (alteration in original) (emphasis added) (internal quotation marks omitted). Indeed, at oral argument, the government conceded that Bonilla's childhood experience would "not have direct relevance unless [Papantoniadis] knew about it."  And the record here does not suggest that Papantoniadis was aware of Bonilla's father's murder before assaulting Teixeira in front of her.

Nonetheless, any error by the district court in admitting Bonilla's brief, initial testimony about witnessing her father's murder was harmless.  For one, the subsequent portion of her testimony also mentioned her father's murder and was admitted without objection, thus canceling out any potential harm from her initial, objected-to testimony. For another, both Teixeira and do Carmo testified that Papantoniadis's attack on Teixeira was frightening.  And Hernandez testified that do Carmo was "white in the face" after it.  Thus, because there was ample testimony to support a jury finding that Papantoniadis's attack on Teixeira would have scared Bonilla even aside from her childhood experience, it is highly probable that Bonilla's challenged testimony did not influence the verdict.  See Turner, 684 F.3d at 262.

- 28 -

### 3. Hernandez's Testimony About a Former Employee

Lastly, Papantoniadis challenges the district court's admission of a portion of Hernandez's testimony. During the government's case-in-chief, Hernandez testified about Papantoniadis's threats to deport employees. See supra Section II.A.2.iii. On cross-examination, Papantoniadis asked Hernandez whether he had ever told anyone at the DOL or the Department of Homeland Security that Papantoniadis had threatened to deport him personally. Hernandez responded that he had not. Then, on redirect examination, the government asked Hernandez about his declaration in support of his visa application, which explained that Ruben, a former Stash's employee, was deported after announcing his intention to quit.

Papantoniadis objected to this line of questioning about Ruben. During the attorneys' exchange at sidebar, the government indicated that it was eliciting this testimony to rebut the suggestion that Hernandez had fabricated his earlier testimony about Papantoniadis's deportation threats and thus to rehabilitate Hernandez's credibility as a witness. For his part, Papantoniadis argued that his cross-examination of Hernandez had not opened the door to the Ruben testimony because his questions had been limited to any threats to deport Hernandez, not other employees. The district court permitted the government to proceed, with a limiting instruction that Hernandez's understanding of what happened to

Ruben should be considered only for the impact it had on Hernandez himself, and <u>not</u> to prove that Ruben was actually deported.

Even assuming that the district court abused its discretion in admitting the testimony about Ruben, any error was ultimately harmless. The court's limiting instruction made clear that the jury could not consider Hernandez's testimony concerning Ruben for the truth of the matter asserted. And Hernandez was clear that he learned about Ruben's deportation only after Hernandez had left Stash's, and thus the incident could not have affected Hernandez's state of mind while working there. Thus, it is highly probable that Hernandez's challenged testimony did not influence the verdict. See <u>Turner</u>, 684 F.3d at 262.

In sum, we find no reversible error as to any of the district court's evidentiary rulings.

### C. Sentencing Issues

Papantoniadis next challenges his sentence as procedurally unreasonable based on what he views as errors in calculating the guidelines sentencing range (GSR).

We review preserved procedural challenges to a sentence for an abuse of discretion.[2] See <u>United States</u> v. <u>Burgos</u>, 133 F.4th 183, 189 (1st Cir. 2025). In doing so, we review the district court's factual findings at sentencing for clear error and its

_____

[2] We apply the Sentencing Guidelines that were in place at the time of the sentencing.

legal conclusions de novo.  See id.  The court's factual findings must be supported by a preponderance of the evidence.  See id. "Our clear-error review warrants reversal only if, after reviewing the record, we develop 'a strong, unyielding belief that a mistake has been made.'"  Id. at 190 (quoting United States v. Newton, 972 F.3d 18, 20 (1st Cir. 2018)).

"Where 'the [GSR] would have been the same regardless of whether the district court's [g]uidelines calculations were correct, we have generally found any potential error harmless.'" United States v. Wright, 101 F.4th 109, 115 (1st Cir. 2024) (alterations in original) (quoting United States v. Graham, 976 F.3d 59, 62 (1st Cir. 2020)).  "[O]n occasion," however, we have reviewed a record to ensure that the alleged error "did not influence the sentencing judge, even where the [GSR] would have remained unchanged in any event."  Graham, 976 F.3d at 62.

In determining Papantoniadis's sentence, the district court largely adopted the calculations in the presentence investigation report (PSR), so we begin by describing those calculations.  Based on section 2H4.1(a)(1) of the Sentencing Guidelines, the Probation Officer identified the base offense level as 22 for each count that resulted in a conviction.  See U.S. Sent'g Guidelines Manual § 2H4.1(a)(1) (U.S. Sent'g Comm'n 2024) [hereinafter "U.S.S.G."].  Turning to section 2H4.1(b), the Probation Officer then applied various enhancements for the

- 31 -

duration of the forced labor and the commission of other felony offenses. See id. § 2H4.1(b)(3), (4). The Probation Officer's calculations of the adjusted offense level (AOL) for each count are listed below:

| Count | Employee | Charge | Enhancements | AOL |
|---|---|---|---|---|
| 2 | Hernandez | Forced Labor | Forced labor for more than one year (+3) | 25 |
| 3 | do Carmo | Forced Labor | Forced labor for more than one year (+3) | 25 |
| 4 | Bonilla | Forced Labor | Forced labor for more than one year (+3) | 25 |
| 5 | Teixeira | Attempted Forced Labor | Forced labor for a period between 180 days and one year (+2)<br><br>Felony assault and battery and strangulation (+2) | 26 |
| 6 | Passos | Attempted Forced Labor | Forced labor for more than one year (+3)<br><br>Felony assault and/or assault with a dangerous weapon (+2) | 27 |
| 7 | Yanes | Attempted Forced Labor | Forced labor for more than one year (+3) | 25 |

Following section 3D1.4 of the Sentencing Guidelines,[3] the Probation Officer then calculated the combined offense level by taking the highest AOL -- here, 27 for count 6 as to Passos -- and adding five offense levels for the other counts of conviction.  See id. § 3D1.4.  This produced a total offense level (TOL) of 32.

The district court adopted the Probation Officer's calculations and determined that Papantoniadis's criminal history category (CHC) was I.[4]  Based on a TOL of 32 and a CHC of I, the court then determined that the GSR was 121 to 151 months.

After accounting for the sentencing factors under 18 U.S.C. § 3553(a), the district court imposed a downward variance and sentenced Papantoniadis to 102 months in prison.  The court explained that, in its view, the GSR "produce[d] a result that [was] higher than appropriate" because the Sentencing Guidelines group actual slavery with forced labor.

---

[3] Neither party contests the application of the grouping rules under section 3D1.2 of the Sentencing Guidelines.

[4] To determine the number of units for the purposes of adding offense levels under section 3D1.4, the district court started with one unit for the highest AOL -- here, 27 for count 6 as to Passos.  See U.S.S.G. § 3D1.4(a).  It then added one additional unit for every count with an AOL that was "equally serious or from 1 to 4 levels less serious" than the highest AOL of 27.  Id. Because the five other counts all fell within this range, the court added one unit for each count, resulting in six units total. Because the number of units exceeded five, it took the highest AOL -- here, 27 -- and increased it by five offense levels, resulting in a TOL of 32.  See id. § 3D1.4 (table).

Papantoniadis claims that the district court incorrectly determined the TOL. According to Papantoniadis, the TOL should have been at most 28, which, along with a CHC of I, would have resulted in a GSR of only 78 to 97 months. As he sees it, the court erred in imposing duration and felony-offense enhancements and in refusing to apply certain reductions. Finding no reversible error for the reasons we set out below, we affirm the district court's sentence.

### 1. Attempt Reductions

Papantoniadis challenges the district court's decision not to apply reductions for the attempted forced labor counts as to Teixeira and Yanes (counts 5 and 7).[5] Section 2X1.1(b)(1) of the Sentencing Guidelines authorizes a three-level reduction from the base offense level if the defendant is convicted of attempt, "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense." U.S.S.G. § 2X1.1(b)(1).

According to Papantoniadis, he did not complete all the acts he thought necessary to commit the substantive offense -- forced labor -- as to Teixeira and Yanes. He argues

---

[5] Although Papantoniadis challenged the exclusion of the attempt reduction as to Passos before the district court, he does not challenge that exclusion on appeal.

that he could have done more to coerce Teixeira and Yanes if he had wanted to force them to remain in his employ.

The district court disagreed, finding that Papantoniadis "clearly completed all the acts he felt necessary to commit the crime." Our review of the record confirms that the preponderance of the evidence supported the court's finding on this point. For example, Papantoniadis assaulted Teixeira, telling him, "You cannot leave," and misrepresented the incident to the police. As for Yanes, Papantoniadis pursued him in a truck, while making a threatening crossed-arms gesture signifying arrest, and submitted a false police report.

The commentary to the Sentencing Guidelines explains that "[i]n most prosecutions for conspiracies or attempts, the substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim. In such cases, no reduction of the offense level is warranted." U.S.S.G. § 2X1.1 cmt. background. Based on the evidence, the district court did not clearly err in declining to apply the attempt reductions.

### 2. Duration Enhancements

Next, Papantoniadis argues that the district court erred in imposing multiple duration enhancements.

Section 2H4.1(b)(3) of the Sentencing Guidelines authorizes a three-level enhancement if the duration of the forced

labor exceeded one year and a two-level enhancement if the forced labor lasted between 180 days and one year. See U.S.S.G. § 2H4.1(b)(3). Papantoniadis objects to the three-level enhancements as to Hernandez, do Carmo, Bonilla, Passos, and Yanes (counts 2, 3, 4, 6, and 7) and the two-level enhancement as to Teixeira (count 5).

The thrust of Papantoniadis's argument is that the district court simply equated each worker's duration of employment with their duration of forced labor. But the record refutes any such error by the district court. At the sentencing hearing, the court acknowledged that "[t]he issue is not the length of employment but the length of the forced labor." (Emphasis added.) After reviewing the issue "fairly carefully" and reading relevant portions of the PSR, the court determined that there was "sufficient evidence in the PSR under the circumstances to find that the enhancement [was] appropriate." Proceeding count by count, we agree with the district court that the evidence supported the duration enhancements.

### i. Count 2: Hernandez

Hernandez worked for Papantoniadis for over two years -- from July 2013 to November 2015. In August 2013, Hernandez witnessed the aftermath of Papantoniadis's attack on Teixeira, making him fear Papantoniadis. During his employment, Papantoniadis threatened Hernandez with deportation, surveilled

him, taunted him, and, in 2015, pursued him in a car when he tried to quit. And when Hernandez developed painful ingrown toenails during his time at Stash's, Papantoniadis denied him time off to seek medical attention. Based on these facts, the district court did not clearly err in finding that Hernandez was subjected to forced labor for over one year.

### ii. Count 3: do Carmo

do Carmo worked for Papantoniadis from 2009 to 2017. Roughly halfway through his employment, in August 2013, do Carmo witnessed Papantoniadis's attack on Teixeira, which made him fearful of his boss. He also observed the incident when Hernandez quit. While do Carmo worked at Stash's, Papantoniadis monitored him, berated him, threatened him with deportation, and, near the end of do Carmo's time at Stash's, responded angrily after he spoke with a DOL investigator. These facts, taken together, support the government's theory that Papantoniadis intended his attack on Teixeira to scare do Carmo into continuing to work at Stash's. Thus, the district court did not clearly err in finding that do Carmo was subjected to forced labor for over one year.

### iii. Count 4: Bonilla

Bonilla worked for Papantoniadis for over three years -- from May 2013 to September 2016. In August 2013, just months after she began working at Stash's, she witnessed Papantoniadis attack Teixeira, which made her afraid of her new

employer.  She also experienced additional threatening behavior by Papantoniadis, including his statement that he had "powerful friends."  Bonilla's fear of Papantoniadis persisted through the day that she quit, and she even moved to a new address to avoid him.  These facts, taken together, support the theory that Papantoniadis intended his attack on Teixeira to scare Bonilla into continuing to work at Stash's.  Thus, the district court did not clearly err in finding that Bonilla was subjected to forced labor for over one year.

### iv. Count 6: Passos

Passos worked for Papantoniadis for nearly two years -- from June 2013 to May 2015.  After five or six months, Papantoniadis started "treating [Passos] bad" and telling Passos that "if [he] quit, [Papantoniadis was] going to call immigration."  "[E]very time" Passos told Papantoniadis that he needed to find another job, Papantoniadis responded, "You cannot leave me," "I'm going to call immigration for you," "I know where you live," or "You [do] not have papers."  Papantoniadis also harassed Passos, touching his nipples while saying, "You're going to be my bitch forever."  Passos testified that he felt "forced to stay."  He finally left after Papantoniadis threw a pan at him.  On these facts, the district court did not clearly err in finding that Passos was subjected to forced labor for over one year.

### v. Count 7: Yanes

Yanes worked part-time for Papantoniadis for a few months in 2013 and then returned to Stash's in 2015, working full-time until February 2018. After Yanes returned in 2015, Papantoniadis monitored, criticized, and insulted him, which made him feel intimidated. Text messages introduced at trial reveal that interactions of this nature began over a year before Yanes's departure. Yanes was also afraid to confront Papantoniadis when he was underpaid and could not take days off. On Yanes's last day of work, Papantoniadis pursued him in a truck and made a threatening gesture. Based on these facts, the district court did not clearly err in finding that Yanes was subjected to forced labor for over one year.

### vi. Count 5: Teixeira

Teixeira worked for Papantoniadis for less than one year -- from October 2012 to August 2013. While employed, he could not take days off and did not receive regular breaks. Papantoniadis yelled at employees, which intimidated Teixeira, and assaulted Teixeira on his last day of work.

At oral argument, the government conceded that the duration enhancement of two levels as to Teixeira -- reflecting forced labor for a period between 180 days and one year -- was probably the "most vulnerable" duration enhancement at issue on appeal. We agree.

But even assuming that the district court erred in imposing the enhancement, any such error would have been harmless because it would not have affected the GSR. See Wright, 101 F.4th at 115. Because the AOL for count 6 as to Passos was the highest at 27, it drove the calculation of the TOL. See supra Section II.C. If the district court had not applied the two-level duration enhancement as to Teixeira, the AOL for count 5 as to Teixeira would have been 24 instead of 26. Even in that circumstance, the court still would have added one unit for that count for the purposes of section 3D1.4 because the AOL for count 5 would have remained "1 to 4 levels less serious" than the AOL for count 6. U.S.S.G. § 3D1.4(a).

Further, even if the district court had not applied either the two-level duration enhancement or the two-level felony-offense enhancement as to Teixeira (more on that enhancement below), the GSR would have remained the same. That is because the AOL for Teixeira would have topped off at 22, and the court still would have added one half unit for the purposes of section 3D1.4. See id.; see also infra Section II.C.3.ii. Holding the units for the other counts constant, the TOL would have remained 32 because the total number of units (five and one-half units) would have still exceeded five for the purposes of section 3D1.4. See U.S.S.G. § 3D1.4 (table).

In sum, we affirm the district court's application of the various duration enhancements.

### 3. Felony-Offense Enhancements

Finally, Papantoniadis challenges the application of the felony-offense enhancements as to Teixeira (count 5) and Passos (count 6). Under the Sentencing Guidelines, a two-level enhancement is required when "any other felony offense was committed during the commission of, or in connection with," a forced labor offense. Id. § 2H4.1(b)(4). For the purposes of section 2H4.1(b)(4), "any other felony offense" means "any conduct that constitutes a felony offense under federal, state, or local law (other than an offense that is itself covered by this subpart)." Id. § 2H4.1 cmt. n.2.

For count 5 as to Teixeira, the Probation Officer applied a two-level enhancement for assault and battery and strangulation based on the August 2013 incident when Papantoniadis attacked Teixeira on his last day. And for count 6 as to Passos, the Probation Officer applied a two-level enhancement for assault and/or assault with a dangerous weapon based on the May 2015 incident when Papantoniadis threw a pan at Passos, even though the pan did not hit him. At the sentencing hearing, the district court overruled Papantoniadis's objections to the enhancements.

### i. Count 6: Passos

We turn first to the question of whether Papantoniadis committed a separate felony offense as to Passos. Papantoniadis does not dispute that assault with a dangerous weapon under Mass. Gen. Laws ch. 265, § 15B(b), is a felony offense that would warrant the two-level enhancement.[6] Rather, he claims that the evidence was insufficient to establish that he acted with the requisite intent or that the pan he threw was a dangerous weapon.

We find Papantoniadis's arguments as to this enhancement unpersuasive. First, Papantoniadis contends that, to find him guilty of assault, Massachusetts law requires proof that he intended to hit Passos with the pan when he threw it. He maintains that the evidence does not show that he acted with such intent. But Papantoniadis is incorrect that such intent is necessarily required for assault. Under Massachusetts common law, "an assault may be perpetrated in either of two ways": "'an attempted battery' or 'an immediately threatened battery.'" Commonwealth v. Melton, 763 N.E.2d 1092, 1096 (Mass. 2002) (quoting Commonwealth v. Gorassi, 733 N.E.2d 106, 109 (2000)). Although attempted battery requires proof "that the defendant intended to commit a battery,"

_____

[6] Although the Probation Officer recommended a two-level enhancement as to Passos for "assault and/or assault with a dangerous weapon," Papantoniadis's objection to the PSR and the Probation Officer's response, as well as the parties' briefs, treat assault with a dangerous weapon as the relevant felony offense. And so, in analyzing the enhancement, we focus on that offense.

immediately threatened battery requires only proof "that the defendant intentionally engaged in menacing conduct that reasonably caused the victim to fear an imminent battery." Id. at 1096 & n.4; see also Commonwealth v. Leonard, 58 N.E.3d 343, 349 (Mass. App. Ct. 2016). The government points to immediately threatened battery as the relevant theory of assault here.

The district court's application of the enhancement was justified, at a minimum, under the immediately threatened battery theory of assault that exists under Massachusetts law. At trial, Passos testified that Papantoniadis "yell[ed]" at him and "got so mad" before throwing the pan. Papantoniadis "almost" hit him with the pan, causing Passos to feel "so scared." This testimony was enough to meet the requirements of this theory of assault -- that Papantoniadis intentionally engaged in menacing conduct that caused Passos to fear an imminent battery. Melton, 763 N.E.2d at 1096. Although the district court did not explicitly rely on the immediately threatened battery theory at sentencing, we see no clear error in its application of the enhancement given the evidence supporting that Papantoniadis "intended to put [Passos] in fear." Commonwealth v. Oswaldo O., 116 N.E.3d 35, 38 (Mass. App. Ct. 2018).

Second, Papantoniadis argues for the first time on appeal that the evidence could not support a finding that the pan was a "dangerous weapon." We review his unpreserved procedural

claim for plain error.[7]  See United States v. Colón-De Jesús, 85 F.4th 15, 20-21 (1st Cir. 2023).

"Plain error is a formidable standard of review, which requires [Papantoniadis to] demonstrate: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Candelario-Ramos, 45 F.4th 521, 525 (1st Cir. 2022) (internal quotation marks omitted) (quoting United States v. Blewitt, 920 F.3d 118, 123 (1st Cir. 2019)).  But Papantoniadis "makes no attempt to show how his . . . claim[] satisf[ies] the demanding plain-error standard -- his [opening] brief fails to even mention plain error, let alone argue for its application here."  Coleman, 149 F.4th at 56 (omission in original) (quoting Candelario-Ramos, 45 F.4th at 525).

In any event, there was no plain error as to this claim. When an object is not "dangerous per se,"[8] Massachusetts law asks

---

[7] In his reply brief, Papantoniadis argues that his objection to the PSR's inclusion of the felony-offense enhancement as to Passos "sufficiently encompassed [his] arguments presented on appeal," including his argument that the pan was not dangerous. But his objection to the PSR focused only on the direction he threw the pan, and not the characteristics of the pan.  He therefore failed to raise this objection below.

[8] Under Massachusetts law, an object is "dangerous per se" if it is "designed and constructed to produce death or great bodily harm."  Commonwealth v. Tevlin, 741 N.E.2d 827, 833 (Mass. 2001)

"whether the object, as used by the defendant, is capable of producing serious bodily harm." Commonwealth v. Tevlin, 741 N.E.2d 827, 833 (Mass. 2001) (quoting Commonwealth v. Mercado, 509 N.E.2d 300, 304 (Mass. App. Ct. 1987)). Because there was no evidence of the pan's size, shape, or weight, Papantoniadis argues that the evidence was insufficient to show that the pan, as used, was dangerous.

We see no obvious error in the district court's application of the enhancement given the "capable of producing serious bodily harm" standard. At a minimum, it was not clear error for the court to perceive a man throwing an object of this kind in an enclosed area, such as Stash's kitchen, as meeting the relevant standard. Indeed, Passos testified that he was "so scared" when Papantoniadis threw the pan that it caused him to leave Stash's. Thus, there was no plain error.

### ii. Count 5: Teixeira

Papantoniadis also objects to the felony-offense enhancement as to Teixeira for assault and battery based on Mass. Gen. Laws ch. 265, § 13A.[9] According to Papantoniadis, simple

---

(quoting Commonwealth v. Appleby, 402 N.E.2d 1051, 1056 (Mass. 1980)).

[9] The district court also applied the felony-offense enhancement based on strangulation under Mass. Gen. Laws ch. 265, § 15D, which became law in 2014. Papantoniadis contests this enhancement because there was no felony offense for strangulation

assault and battery is only a misdemeanor under Massachusetts law and therefore does not warrant the enhancement.

This argument raises a complicated question about how to interpret the phrase "conduct that constitutes any other felony offense" in section 2H4.1 of the Sentencing Guidelines. Namely, Papantoniadis contests whether a state-law offense that is classified as a misdemeanor under state law, even if it is punishable by a term of imprisonment exceeding one year, can qualify as a "felony offense." See U.S.S.G. § 2H4.1 cmt. n.2. The government acknowledged at oral argument that the felony-offense enhancement as to Teixeira was "vulnerable." But we need not decide whether the district court erred in applying this enhancement because it did not change the GSR. See supra Section II.C.2.vi.; Wright, 101 F.4th at 115.

In sum, we affirm the sentence imposed by the district court.

### D. Continuance and New Trial Motions

Finally, Papantoniadis argues that the district court erred in declining to grant a longer continuance and in denying his related motion for a new trial based on the government's delayed disclosure of certain discovery materials. We find no

---

in Massachusetts at the time he committed the alleged offense in 2013. The government concedes this point.

abuse of discretion by the district court in its rulings on these interconnected motions.

To recap, a grand jury indicted Papantoniadis in March 2023.  In the months that followed, the government produced significant discovery, including witness interview statements from the seven employees identified in the indictment by number alone and not by name.  With the parties' input, in December 2023, the district court scheduled the trial to begin on May 20, 2024.

On April 17, 2024, about one month before the trial was set to start, Papantoniadis confirmed that he did "not intend to move for a continuance" and instead "intend[ed] to proceed with trial as planned."  The following week, on April 22, 2024, the government produced approximately 10,000 pages of discovery, which included medical records of an employee and grand-jury transcripts.  On April 30, 2024, the government disclosed the names of the seven employees and the specific immigration benefits that they had received.  Then, on May 3, 2024, the government produced approximately 19,000 pages of additional discovery, which consisted largely of documents from the DOL investigation.  Of that total, more than 16,000 pages were copies of Papantoniadis's own business records, including payroll records, which the DOL had obtained from him during its investigation.

On May 8, 2024, less than two weeks before the trial was scheduled to begin, Papantoniadis moved to continue the trial until

September 30, 2024.  He contended that he was unable to "process the sheer volume of [recent] discovery with proper attention and detail."  In a separate filing the next day, May 9, 2024, Papantoniadis pointed to the May 3, 2024 production as part of the reason for his request for a continuance.

After hearing oral argument, the district court granted the motion in part and denied it in part.  It delayed the start of trial by eight days, until May 28, 2024, but kept the previous date for jury empanelment (May 20, 2024).  The result was that the court provided the defense with an extra week to review the recent discovery in preparation for trial.

Five days before the trial began, on May 23, 2024, the government produced approximately 1,600 pages of additional material.  This material consisted primarily of immigration files concerning the seven employees.

After the trial concluded, Papantoniadis filed a motion for a new trial under Federal Rule of Criminal Procedure 33, arguing that the government's delay in making required disclosures violated Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  In support of that motion, he maintained that the district court abused its discretion in granting only an eight-day continuance after the late disclosures.

In a detailed opinion, the district court denied Papantoniadis's new trial motion.  Briefly put, the court

- 48 -

determined that some of the government's delayed disclosures -- including its disclosures of immigration benefits on April 30, 2024, and immigration files on May 23, 2024 -- violated its obligations under the local rules.  But the court ultimately concluded that any delay did not unfairly prejudice Papantoniadis in preparing for trial.  In so ruling, the court explained that Papantoniadis had "substantially overstate[d] the burden imposed by the volume of the production," which "did not burden the defense to such a degree that it rendered the trial fundamentally unfair."

## 1. Continuance Motion

We review the district court's ruling on the motion to continue for an abuse of discretion.  See United States v. Carbone, 110 F.4th 361, 372 (1st Cir. 2024).  Considering the district court's "broad discretion in managing [its] docket[]," we will not lightly overturn its ruling.  Id. (quoting Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 50 (1st Cir. 2012)).  In our analysis, we "look[] primarily to the persuasiveness of the trial court's reasons" for its decision, giving "due regard" to the factors cited by the court for reaching its ruling as well as "to its superior point of vantage."  Id. (quoting Delgado, 668 F.3d 42 at 50).  To guide our review, we consider "the reasons contemporaneously presented in support of the request, the amount of time needed for effective preparation, the complexity of the case, the extent of

inconvenience to others if a continuance is granted, and the likelihood of injustice or unfair prejudice attributable to the denial of a continuance." United States v. Williams, 630 F.3d 44, 48 (1st Cir. 2010) (quoting United States v. Rodríguez-Durán, 507 F.3d 749, 763 (1st Cir. 2007)) (affirming the district court's denial of the defendant's motion to continue trial, "especially in light of the court's previous [week-long] continuance to accommodate [defense counsel]").

To overturn a district court's ruling denying a motion to continue, prejudice is "essential," and a party must "identif[y] specific, concrete ways in which the denial resulted in 'substantial prejudice' to his or her defense." Carbone, 110 F.4th at 372 (quoting United States v. Delgado-Marrero, 744 F.3d 167, 196 (1st Cir. 2014)). Thus, Papantoniadis "bears the burden of demonstrating to us that in refusing the continuance request, 'the district court exhibited an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" Id. (quoting Delgado, 668 F.3d at 50).

Papantoniadis has not demonstrated that the district court abused its discretion in denying his request to delay the trial date by more than four months. To begin, we are not persuaded that the district court "exhibited an unreasonable and arbitrary insistence upon expeditiousness." Id. (quoting Delgado, 668 F.3d at 50). Rather, the district court carefully considered the

- 50 -

relevant legal factors. For example, the district court considered (1) that the case was not "unusually complex"; (2) that Papantoniadis had retained three experienced lawyers, and there was "no reason to think that counsel ha[d] not been diligent"; (3) the potential impact on and inconvenience to the government and its witnesses, including the seven employees; (4) the nature of the discovery, including materials from the DOL investigation that had been available to the defense for some time; and (5) that the delay in disclosing the seven employees' names, although suboptimal, did not present "an incredibly difficult problem [for the defense] to overcome." See Williams, 630 F.3d at 48 (identifying the relevant factors). Although Papantoniadis faults the district court for considering how a continuance would disrupt its schedule, we have previously observed that "the extent of any inconvenience to others," including "the court," is a relevant factor in the analysis. Carbone, 110 F.4th at 372. As for the likelihood of prejudice, the district court expressed "confiden[ce]" that defense counsel could review "what need[ed] to be reviewed" with the additional eight days.

Overall, Papantoniadis has failed to meaningfully challenge the district court's assessment of the relevant factors. Although we understand the hectic nature of the weeks before trial, Papantoniadis has never explained why more than four months was necessary for a four-person defense team (three attorneys plus a

paralegal)[10] to review about 20,000 pages of documents, 16,000 of which were his own documents and previously available. He also has not pointed to some more reasonable continuance, longer than eight days but shorter than four months, that in his view would have been appropriate. Thus, we reject his challenge to the district court's ruling on the motion to continue.

### 2. New Trial Motion

We also review the district court's denial of Papantoniadis's motion for a new trial based on the delayed disclosure of discovery for "manifest abuse of discretion." United States v. Martínez-Hernández, 118 F.4th 72, 91 (1st Cir. 2024) (quoting United States v. Martínez-Mercado, 919 F.3d 91, 104-05 (1st Cir. 2019)). Because the district court "has a special sense of the ebb and flow of the trial," we afford "substantial deference to the [district court's] views regarding the likely impact of belatedly disclosed evidence." Id. (quoting United States v. Tucker, 61 F.4th 194, 207 (1st Cir. 2023)).

In a criminal case, the government has "an 'affirmative duty to disclose evidence favorable to a defendant,'" otherwise known as "Brady material." United States v. Montoya, 844 F.3d 63, 71 (1st Cir. 2016) (quoting Kyles v. Whitley, 514 U.S. 419, 342 (1995)). The government's obligation to disclose Brady material

---

[10] Not counting a fourth attorney who joined the team two weeks before the trial began.

is not limited to truly exculpatory evidence; it also "includes the disclosure of information potentially useful to impeaching the credibility of a government witness where that information is favorable and material to guilt or punishment." Roe v. Lynch, 997 F.3d 80, 82 (1st Cir. 2021) (citing Giglio, 405 U.S. at 154-55). If the government fails to fulfill its duty in a timely manner, "the defendant may be entitled to relief." Montoya, 844 F.3d at 71.

Papantoniadis's Brady claim is "one of delayed disclosure rather than complete suppression." United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir. 2002). Thus, "we need not reach the question whether the evidence at issue was 'material' under Brady unless [Papantoniadis] first can show that [his] counsel was 'prevented by the delay from using the disclosed [evidence] effectively in preparing and presenting [his] case.'" Id. (quoting United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)).

In the circumstances of delayed disclosure, the "principal concern" is "whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy." Id. (quoting United States v. Josleyn, 99 F.3d 1182, 1196 (1st Cir. 1996)). To meet his burden, Papantoniadis must, at the very least, "make a 'prima facie' showing of a plausible strategic option which the delay

foreclosed." United States v. Cruz-Feliciano, 786 F.3d 78, 87 (1st Cir. 2015) (quoting United States v. Van Anh, 523 F.3d 43, 51 (1st Cir. 2008)); see also Delgado-Marrero, 744 F.3d at 199 ("When Brady or Giglio material surfaces belatedly, 'the critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect.'" (quoting United States v. Pérez-Ruiz, 353 F.3d 1, 8 (1st Cir. 2003))).

Papantoniadis has failed to meet his burden of showing an impact on counsel's effectiveness at trial from the belated disclosure. Mainly, Papantoniadis contends that the government's late disclosure of discovery violated Brady by preventing him from raising a collusion defense. From his perspective, the delayed disclosure foreclosed him from "present[ing] compelling evidence that [the] employees had colluded to falsely paint themselves as forced-labor victims to obtain immigration benefits available to them if they cooperated with the government in Papantoniadis['s] prosecution."

Papantoniadis has not demonstrated, however, that additional time would have "caused the defense to change its trial strategy." Lemmerer, 277 F.3d at 588 (quoting Josleyn, 99 F.3d at 1196). As proof of collusion, Papantoniadis points to specific DOL documents, which identify the points at which various employees provided relevant information to the DOL. He contends that the

timing of these events, after the first employee learned of potential immigration benefits, was suspicious. But we are unpersuaded that earlier access to these records would have resulted in a new litigation strategy or, as the government states, "developed into more than a few sentences of closing argument." As the district court explained, the record does not demonstrate "why those particular disclosures have such special significance that their late disclosure rendered the entire trial unfair."

Finally, we agree with the district court that Papantoniadis "substantially overstates the burden imposed by the volume of the production." For one, Papantoniadis exaggerates the number of discovery documents at issue. He asserts that, "[s]hortly before trial, the government deluged the defense with roughly 40,000 pages of discovery." But instead, the government produced approximately 10,000 pages of discovery on April 22, 2024, well before Papantoniadis moved for a continuance. And only later, on May 3, 2024, did the government produce an additional 19,000 pages of discovery, most of which were Papantoniadis's own business records. As the district court observed, the government produced those documents, which were written in English and included "relatively brief" statements from the employees, "in an organized manner, with an accompanying index." Given the nature of these materials, we are not persuaded that their delayed disclosure imposed an unfair burden on the defense team. Thus, we leave

untouched the district court's decision to deny Papantoniadis's motion for a new trial.

### III. CONCLUSION

For all these reasons, we **<u>affirm</u>** Papantoniadis's convictions and sentence.